941 So.2d 1017 (2006)
Jason LOONEY, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-159.
Supreme Court of Florida.
June 22, 2006.
Rehearing Denied October 27, 2006.
*1019 Baya Harrison, III, Monticello, Florida and Frank E. Sheffield, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General and Carolyn M. Snurkowski, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Jason Brice Looney, a prisoner under sentence of death, appeals the circuit court's order denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm the denial of relief.

FACTS AND PROCEDURAL HISTORY
Jason Brice Looney was convicted of the first-degree murders of Melanie King and Robin Keith Spears, burglary of a dwelling while armed with a firearm, armed robbery with a firearm, arson of a dwelling, and use of a firearm in the commission of a felony. See Looney v. State, 803 So.2d 656, 664 (Fla. 2001). The jury, by a vote of ten to two, recommended the death penalty. See id. Following that recommendation, the trial judge sentenced Looney to death for each murder. In its opinion affirming the convictions, this Court detailed the facts surrounding the murders of King and Spears, as follows:
At approximately 11 p.m. on July 26, 1997, Looney and his codefendants [Guerry Wayne Hertz and Jimmy Dempsey] left an acquaintance's house on foot within walking distance from the victims' home. All three men were armed with guns. A resident who lived about 500 yards from the victims testified that Hertz appeared at her door at about 2 a.m. asking to use her phone because "his truck had broken down." When she refused, the trio continued down the road towards the victims' home and, upon seeing the victims' black Mustang, Looney said, "There's my car right there. That's the one I want."
Dempsey and Hertz went to the victims' front door as a decoy and asked if they could use the phone. King provided them with a cordless phone, and Dempsey feigned making a phone call. When Dempsey attempted to return the phone, Hertz pointed his gun at King and forced his way in. Looney then entered and pointed his rifle at Spears. Spears and King were bound and gagged with duct tape and placed face down on their bed. Looney and his codefendants removed a significant amount of the victims' property, including a VCR, a television, jewelry, furniture, and CDs, and loaded the victims' belongings into the victims' two vehicles. Looney also found approximately $1500 *1020 of the victims' money in an envelope, which was ultimately divided equally among the three.
Looney and Hertz concluded that they could leave no witnesses and informed Dempsey of their decision. Dempsey said Looney and Hertz then poured accelerants throughout the victims' home. All three men, still armed, went to the bedroom where the victims were bound, side-by-side, face down on their bed. When they entered the back bedroom, King said that she would "rather die being burnt up than shot." She stated, "Please, God, don't shoot me in the head." Hertz replied, "Sorry, can't do that," and then he proceeded to open fire; Looney followed and then Dempsey. The victims died as a result of the gunshot wounds.
Subsequent to the shootings, the victims' home was set ablaze. Hertz drove away in the victims' white Ford Ranger, and Looney drove the victims' black Ford Mustang, with Dempsey as a passenger. According to Dempsey, the whole episode at the victims' home lasted about two hours. The trio proceeded to Hertz's house and unloaded the stolen items and divided up the money. Two employees at the Wal-Mart in Tallahassee testified that the three men made purchases at the store at around 5 a.m. the morning of the murders, before "showing off" their new vehicles, i.e., a black Mustang and a white Ford Ranger, to both of the employees. A Wal-Mart receipt for a clothing purchase was later found in the victims' Mustang, corroborating the employees' testimony.
Looney and his codefendants made their way to Daytona Beach Shores where, later that day, they were involved in a pursuit and shootout with police. Looney and Dempsey were arrested after abandoning and fleeing from the victims' black Mustang. Hertz abandoned the victims' Ford Ranger after being shot, and he paid a cabdriver $100 to drive him to his aunt's house in St. Augustine. Hertz was arrested that same day in St. Augustine, and victim Spears' .9mm gun was recovered from Hertz's bag.
Id. at 662-63.

The Guilt Phase
The evidence presented during the guilt phase of Looney's trial was summarized in this Court's opinion affirming his convictions on direct appeal, as follows:
A firearms expert with FDLE testified that one of the bullets recovered from the area of the victims' burned bed was fired from the .380 Lorcin handgun recovered from Looney at the time of his arrest in Daytona Beach, i.e., the same handgun owned by Keith Spears and used, according to Dempsey, by Hertz to shoot the victims. The other bullet was fired from a .30 caliber carbine rifle, not inconsistent with [the] .30 caliber rifle used by Looney to shoot the victims, and later recovered in the victims' Mustang. A roll of duct tape, Looney's wallet with $464, and Dempsey's wallet with $380 were also found in the Mustang. A fingerprint analyst with FDLE analyzed latent fingerprints taken from the Mustang and concluded that Hertz and his codefendants had all touched the car. The chemist found evidence of various accelerants on items of clothing found in the Mustang. In addition, a law enforcement investigator with the State Fire Marshal's Office testified that the kind of damage that was done by the fire does not happen unless an accelerant is used.
The state medical examiner testified that the bodies were severely burned. He graphically detailed the condition of the bodies as depicted in the photographs: *1021 the legs were burned off below the knees, the hands were burned to nubs, the bones of the arms were fractured by the fire, and the skulls were burned partially away. The victims had to be positively identified by dental records. The medical examiner also testified that there could have been other injuries that were not detected due to the extensive burns.
King was shot at least two times in the head, which caused her death. However, the medical examiner was not able to trace the path of the bullet because the skull was burned away. He testified that it was possible that other bullets struck the body, which could not be determined because of the fire. King lived one to two minutes after she was shot. However, there was no soot in the trachea, indicating that she was not alive when the fire started. Spears was shot at least one time in the head, which caused his death. The bullet went in the back of the neck and exited above the right eye. Spears also lived one to two minutes after he was shot, and again, no soot was discovered in his trachea, meaning that he was dead at the time of the fire.
The defense did not present any evidence.
Id. at 663-64.

The Penalty Phase
At the penalty phase, the State presented two witnesses relevant to defendant Looney.[1] Karen King and Janet Spears, the mothers of victims Melanie King and Keith Spears, respectively, both read previously prepared victim impact statements into the record.
The defense presented four witnesses: Robert Kendrick, Looney's probation officer, Andrew Harris, an incarcerated felon, and Looney's birth mother and grandmother. Robert Kendrick testified that Looney was an average probationer and was not in violation of his probation on the date of the murders. Andrew Harris testified that in conversations in jail with Jimmy Dempsey, the third codefendant, Dempsey stated that Looney was only the lookout during the murders and that Dempsey should have shot Looney because he was the one most likely to testify against the other two. Looney's birth mother and grandmother presented evidence related to the circumstances surrounding Looney's birth, his removal from their care and placement with his eventual adoptive family at the age of eighteen months, and the limited contact with his grandmother from that point forward.
In sentencing Looney to death, the trial judge found six individual aggravating factors: (1) that the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (substantial weight); (2) that the murders were committed while the defendant was engaged in the commission of a burglary, arson, and robbery (great weight); (3) that the murders were committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody (great weight); (4) that the murders were committed for financial gain (merged with second aggravator); (5) that the murders were especially heinous, atrocious or cruel ("HAC") (great weight); and (6) that the murders were committed in a cold, calculated, and premeditated manner without pretense of moral or legal justification (great weight). See id. at 664.
*1022 In mitigation, the trial court found only one statutory mitigator, based on Looney's age at the time of the murders, which was given moderate weight. See id. With respect to nonstatutory mitigation, the trial court found: (1) Looney's troubled childhood (significant weight); (2) Looney had no significant criminal history (marginal weight); (3) Looney was remorseful (moderate weight); (4) that society would be adequately protected by the imposition of a life sentence (some weight); and (5) that codefendant Dempsey was given a life sentence (significant weight). See id.
In imposing the sentence of death, the trial judge noted that "[a] review of all the evidence causes the evidence of mitigation to pale into insignificance considering the enormity of the proven and appropriately considered aggravating factors."

Direct Appeal
On direct appeal, this Court affirmed Looney's murder convictions and death sentences, denying all of Looney's claims,[2] none of which are relevant to the instant postconviction appeal. See Looney, 803 So.2d 656. In June 2002, certiorari was denied by the United States Supreme Court. See Looney v. Florida, 536 U.S. 966, 122 S.Ct. 2678, 153 L.Ed.2d 850 (2002).

Rule 3.851 Proceedings
On June 30, 2003, Looney filed a rule 3.851 motion for post conviction relief.[3] On March 9, 2004, Looney filed an amended rule 3.851 motion which elaborated on his original ineffectiveness claim and alleged that penalty phase counsel was ineffective for failing to present all available *1023 mental health mitigation. On March 11, 2004, the trial court held a Huff[4] hearing to determine whether an evidentiary hearing on any of Looney's claims was warranted.[5]
At a July 28, 2004, evidentiary hearing, Looney presented Dr. Bill Mosman, a forensic psychologist, who, among other points, testified that there was extant statutory and nonstatutory mental health mitigation which was either not presented or was presented in an ineffective manner during the penalty phase at trial. Dr. Mosman's testimony focused on the failure of Looney's defense counsel to use a mental health expert as a witness during the penalty phase. However, cross-examination revealed that Dr. Mosman had neither reviewed the guilt phase trial transcripts nor contacted Looney's trial counsel to determine why trial counsel chose not to use a mental health expert witness during the penalty phase. Subsequent to the evidentiary hearing, the trial court denied Looney's claims for postconviction relief based in large part on credibility factors that the trial court did not find Dr. Mosman to be a convincing witness. This appeal followed.

ANALYSIS
Following the United States Supreme Court's requirements outlined in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that
[a] claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. Strickland v. Washington, 466 U.S. 668[, 104 S.Ct. 2052, 80 L.Ed.2d 674] (1984); Downs v. State, 453 So.2d 1102 (Fla. 1984). A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). The alleged ineffective assistance of counsel claim is a mixed question of law and fact, subject to plenary review based on Strickland. See Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999). Under this standard, the Court conducts an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id. at 1032-33.
The deference given to the trial court's factual findings when undertaking an ineffective assistance of counsel analysis in this context is related to the trial court's determination of the credibility of witnesses and the weight to give the evidence. This Court recently explained that "[s]o long as the [trial court's] decisions are *1024 supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence." Arbelaez v. State, 898 So.2d 25, 32 (Fla.2005) (quoting Sochor v. State, 883 So.2d 766, 781 (Fla. 2004)). This deference is a recognition of "the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact." Porter v. State, 788 So.2d 917, 923 (Fla.2001).
There is a presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. A fair assessment of attorney performance requires that efforts be made to eliminate the distorting effects of hindsight, to reasonably reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. The defendant carries the burden to overcome the presumption of effective assistance: "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, 104 S.Ct. 2052. "Judicial scrutiny of counsel's performance must be highly deferential." Id.

The Additional Statutory Mitigation
Looney asserts that Cummings was ineffective because he failed to properly present the statutory age mitigator because Cummings did not emphasize that the mitigator is intended to encompass a defendant's emotional and mental age as well as chronological age. Dr. Mosman testified at the evidentiary hearing that although he could not give a specific number to Looney's mental age, he was of the opinion that Looney's mental and emotional age was somewhere in the early- to mid-teen years. In its order denying Looney's postconviction motion, the trial court stated:
With respect to the asserted nonpresented statutory mitigation of the defendant's emotional and social age deficits that he felt were not presented in the appropriate manner, apart from his chronological age, Dr. Mosman testified vaguely and without any specific delineation of any emotional or social deficits of the defendant. On cross examination, although he acknowledged that his IQ testing of the defendant reflected a full scale IQ of 120, in the upper ten percent, Dr. Mosman was reticent to give any specific mental, emotional or social age for the defendant preferring a band of "mid adolescence."
Looney additionally asserts that Cummings was ineffective because he failed to present evidence of the statutory mitigator of extreme emotional disturbance. Dr. Mosman testified that there was data that could have been presented on the extreme emotional disturbance mitigator which was part of the context of these particular crimes. He proceeded to discuss the traumatic abuse that Looney suffered at the hands of his natural grandfather as a baby and the subsequent revelation to him of that incident at age sixteen, the rigidity of Looney's adoptive home, and the depression and other emotional factors that were in play at the time of the crime. In the order denying Looney's motion for postconviction relief, the trial Court stated with regard to this subject matter:
There is no evidence in the record to support that any emotional or cognitive disturbance mental health mitigator asserted by Dr. Mosman, as either statutory or nonstatutory, contributed to the *1025 defendant's actions in committing his crimes.
With respect to both lines of testimony, the trial court stated:
[Dr. Mosman's] asserted additional statutory mitigators are without basis in the record and clearly conflict with the evidence of defendant's conduct and behavior presented during trial. He was not familiar with the significant facts and circumstances or the evidence presented during the guilt phase and his parsing and teasing of the mitigation was strained and conjectural. Dr. Mosman's testimony likely would have been entitled to insignificant weight had it been presented in the penalty phase.
This Court has established that it will not substitute its judgment for that of a trial court on the credibility of witnesses if the trial court's judgment is supported by "competent, substantial evidence." Arbelaez, 898 So.2d at 32 (quoting Sochor, 883 So.2d at 781). The trial court's order describes that the cross-examination of Dr. Mosman revealed that he
had not talked to trial counsel concerning the presentation of defendant's mitigation. . . . He also admitted that he had not read the guilt phase trial transcripts, but had read only the penalty phase. . . . Dr. Mosman had no knowledge of the details of the criminal events or the episode or the interactions between the criminal participants involved in the crimes.
These circumstances support the trial court's determination that Dr. Mosman's testimony would have been given insignificant weight even if it had been presented at trial.
Further, there is no indication in the record that defense counsel Cummings was ever alerted to the fact that either Looney's mental age or his extreme emotional disturbance were potential mitigating factors in the instant matter. The mental health expert at the time of trial never mentioned these subjects to trial counsel. This Court has stated that "[c]ounsel cannot be deemed ineffective . . . simply because he relied on what may have been less than complete pretrial psychiatric evaluations." State v. Sireci, 502 So.2d 1221, 1223 (Fla.1987). Therefore, even if Dr. Mosman's finding as to Looney's mental age and emotional disturbance were undeniable truths, Cummings still would not have been ineffective for relying on Dr. Partyka's assessment which did not include such findings.
Cummings relied on the evaluation by the mental health expert at the time of trial, which did not include findings of either of the alleged additional statutory mitigators. Additionally, the trial Court found Dr. Mosman's testimony unconvincing and concluded that there was not evidence in the record to support these mitigators. Based on the foregoing, we find that defense attorney Cummings was not ineffective for failing to present this alleged additional statutory mitigation and that Dr. Mosman's unconvincing testimony does not undermine our confidence in the proceedings below.

Non statutory Mitigation
Looney asserts that Cummings was also ineffective because he failed to present evidence of available and relevant nonstatutory mitigation. Specifically, Looney alleges that Cummings failed to present evidence on the following twelve issues: (1) Looney's natural mother was a teenager at the time she conceived him, was a runaway, abused drugs and alcohol, earned money as a stripper, and left Looney with her parents at eighteen months of age; (2) Looney was removed from the custody of his natural mother and grandparents at age eighteen months based on allegations of sexual and physical abuse; (3) the *1026 grandparents' home was dysfunctional, the grandfather was an alcoholic, there were allegations of sexual abuse of two other children, and the grandfather later committed suicide; (4) there were problems with abuse in Looney's adoptive home; (5) the environment in the adoptive home led Looney into severe depression and the exhibition of self-destructive behavior; (6) when Looney was fifteen, his adoptive mother informed him that his natural grandfather had committed suicide, and that when he was a baby he had been raped by his natural grandfather; (7) Looney began self-medicating with alcohol; (8) the only support Looney was given during this period was a brief period in alcohol rehabilitation, which failed; (9) Looney ran away to escape the environment of his adoptive home; (10) at the time of the offense, Looney was on his own, depressed, lonely, and angry about his upbringing; (11) clinical testing revealed that Looney did not have an antisocial personality disorder but, instead, suffered from significant clinical depression, anxiety, and self-destructive behavior; and (12) the crimes in the instant matter occurred while Looney was under a great deal of stress. As the State correctly asserts, Cummings presented evidence on virtually all of these issues, and those for which no evidence was presented were unknown to him at the time of trial.
With respect to the traumatic incidents surrounding Looney's removal from the custody of his natural mother and grandparents by a child services department in Texas, defense counsel did in fact present evidence of these events at trial. Looney's natural mother, Susan Podgers, testified at trial that Looney was born when she was seventeen and that she lost custody of him at the age of eighteen months based on allegations of sexual and physical abuse. Glenda Podgers, Looney's natural grandmother, testified that Looney was raped at the age of eighteen months, was subsequently removed from her custody, and that she had discovered the rape after leaving Looney alone with her husband for the day while she went shopping. She also revealed that Looney's adoptive home was a very rigid and controlling environment. She testified that Looney had been informed by his adoptive mother at the age of fifteen that his grandfather had raped Looney when he was a baby, and later committed suicide. She testified that after this information was related to Looney, he was given no support by his adoptive family to deal with these emotionally difficult issues. She confirmed that Looney stopped visiting with her after the traumatic circumstances surrounding his removal from the custody of his natural mother and grandparents were revealed to him.
Looney argues extensively that Cummings was ineffective for failing to present evidence that his adoptive home was an abusive environment. Dr. Mosman testified that the adoptive home was once investigated for possible abuse when marks were discovered on one of the girls in the home, but that the investigation was not pursued. He also mentioned that there were allegations of physical abuse made by a brother, Mark Looney, an adoptive sibling of defendant Looney whom Dr. Mosman had contacted. Although the trial judge sustained a hearsay objection to Dr. Mosman's testimony regarding Mark Looney's statements, and the precise content of the conversation between Dr. Mosman and Mark Looney cannot be determined from the record, Looney asserts on appeal that Cummings was ineffective for failing to locate Mark Looney to present a full background of Looney's life for fifteen years in his adoptive home.
*1027 Evidence of the controlling, rigid environment in the adoptive home was presented through the testimony of Glenda Podgers, Looney's natural grandmother. She testified that Looney's adoptive mother, Mrs. Looney
was extremely controlling. She had to control everything. . . . [S]he had it planned from the time he [defendant Looney] was three that he was going to be the next Billy Graham and nothing, nothing, was going to change that.
Cummings testified at the evidentiary hearing that he did not have Looney's adoptive mother testify because when he had contacted her during his investigation
[s]he was very angry at what [Looney] had done and been charged with, and almost seemed like a reflection on her. She didn't give a darn about what happened to [Looney] from that point on.
Cummings also established that Mrs. Looney gave every indication that Looney's adoptive family would not cooperate in assisting Looney at trial. The trial mental health expert, Dr. Partyka, testified that Looney provided no indication during any interview that he had suffered abuse at the hands of his adoptive parents. Additionally, Cummings received no indication from Looney nor did his own investigation reveal that Looney was ever abused in his adoptive home. Cummings also testified that Looney never identified his adoptive siblings as possible witnesses, although Looney had directed Cummings to other potential witnesses. Based on Mrs. Looney's indication that the adoptive family was not going to assist or testify on Looney's behalf and that Cummings had absolutely no indication that the adoptive home was abusive, it was not unreasonable that Cummings did not attempt to locate other members of the adoptive household for assistance during the penalty phase.
Looney further asserts that Cummings was ineffective because he failed to present evidence as to his "self-medicating" with alcohol starting at the age of sixteen. Cummings testified that although there was an indication of alcohol abuse at an earlier date, there was no indication that the use of alcohol by Looney or his codefendants was related to any behavior or conduct or with regard to the crimes. Thus, it does not appear that Looney's "self-medication" is truly relevant to mitigation in the instant matter.
As to the mitigation with regard to Looney's mental state at the time of the crimes, which Looney asserts Cummings was ineffective for failing to present, Cummings was given no indication by the trial mental health expert that these circumstances were present. Dr. Mosman testified at the evidentiary hearing that Looney was depressed, lonely, feeling adrift and angry at the way he had been raised at the time of these murders. Dr. Partyka testified during the evidentiary hearing, contrary to Dr. Mosman's conclusion with regard to Looney's flight from his adoptive home, that defendant Looney had left his prior home as an impulsive act, a need for change, an indication of an issue of boredom and a need for stimulation more than anything else. Dr. Partyka added that Looney's impulsivity and the desire to travel the country was typical behavior for psychopaths and consistent with his conclusion that defendant Looney was a psychopath. This Court has established that defense counsel is entitled to rely on an evaluation conducted by a mental health expert for trial, even if, in retrospect, that evaluation is less than perfect. See Sireci, 502 So.2d at 1223. Even if Dr. Mosman's conclusion that Looney was in a state of emotional disturbance at the time of these crimes is accurate, Cummings still would not have been ineffective for relying on Dr. *1028 Partyka's assessment, which did not reach a similar conclusion.
Cases Looney advanced to support his assertion that Cummings was ineffective because he failed to discover and present extant mitigation are factually distinguishable because defense counsel in those cases conducted far less thorough investigations into mitigation than did Cummings in the present case. See State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002) ("[C]ounsel did not spend sufficient time to prepare for mitigation. . . ."); Rose v. State, 675 So.2d 567, 572 (Fla.1996) ("[C]ounsel never attempted to meaningfully investigate mitigation. . . ."); Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995) ("Trial counsel's sentencing investigation was woefully inadequate."); Heiney v. State, 620 So.2d 171, 172 (Fla.1993) (concluding that counsel "totally fail[ed] to investigate potential mitigating factors"). Here, on the other hand, the trial court stated in the order denying post conviction relief that
[c]ounsel did conduct a reasonable investigation of mental health mitigation prior to trial and made a strategic and reasonable decision not to present this information through a mental health expert. He did not fail to investigate potential mitigating evidence and he did not fail to obtain an adequate mental health evaluation.

Failure to Use a Mental Health Expert
Looney alleges that Cummings was ineffective for failing to present the testimony of a mental health expert during the penalty phase to, in Dr. Mosman's words, "[tie] all of the disparate pieces of information in the record together through a mental health lens." With regard to the conclusions of Dr. Partyka, a mental health expert consulted by defense counsel, the trial court stated that
[f]rom his battery of testing, extensive interviews and review of the Texas records, he concluded that the defendant had no schizophrenia or psychotic illnesses, had some antisocial tendencies and an IQ full scale of 114. His ultimate diagnosis was that the defendant was a psychopath who typically display social maladjustments or socially unacceptable behavior traits such as lack of remorse, criminal behavior, superficial charm, grandiose sense of self worth, the need for stimulation, pathological lying, manipulativeness, shallow emotions, difficulty with lasting relationships, impulsivity, poor behavior control, lack of empathy, etc. When asked for an example of a person who was a psychopath he responded "the one that comes to most peoples' mind would be Ted Bundy."
. . . Dr. Partyka further noted that the defendant's crimes were impulsive but not panic or anxiety driven. . . .
During the evidentiary hearing, Dr. Partyka testified that Cummings chose not to have Dr. Partyka testify during the penalty phase because:
My recommendation was basically that Mr. Looney has had a very difficult life; however, that I was not going to be able to bring that out without bringing out information that would hurt Mr. Looney, such as my view that he was a psychopath. So it would be more advantageous for Mr. Looney to not have me testify, but to have other people testify as to other mitigating issues in this case.
Defense counsel testified at the evidentiary hearing that he did not present the testimony of Dr. Partyka at the penalty phase because he did not want Dr. Partyka's finding that defendant Looney was a psychopath with antisocial tendencies to be revealed to the jury. This Court has noted that a diagnosis as a psychopath is a mental health factor viewed negatively *1029 by jurors and is not really considered mitigation. See Dufour v. State, 905 So.2d 42, 57-58 (Fla.2005) (holding that defense counsel made a reasonable strategic decision not to present mental health mitigation testimony at the penalty phase because it would have opened the door to mental health expert's finding that defendant was a sociopath); Reed v. State, 875 So.2d 415, 437 (Fla.2004) ("[T]his Court has acknowledged in the past that antisocial personality disorder is `a trait most jurors tend to look disfavorably upon.' ") (quoting Freeman v. State, 852 So.2d 216, 224 (Fla.2003)). Trial counsel's strategic decision on this point is endorsed even by Looney, whose brief acknowledges that "[n]ot calling Dr. Partyka would have been wise."
Despite this acknowledgment, Looney asserts that Cummings was ineffective for not finding another mental health expert to testify during the penalty phase. Cummings revealed at the evidentiary hearing that he intentionally did not call some other psychiatric expert because in his view if another expert testified it would open the door to the opinions of other experts who had examined Looney, which would have included Dr. Partyka. This Court has stated that "[t]rial counsel is not deficient where he makes a reasonable strategic decision not to present mental health mitigation testimony during the penalty phase because it could open the door to other damaging testimony." Griffin v. State, 866 So.2d 1, 9 (Fla.2003); see also Dufour, 905 So.2d at 57 (citing Griffin). Therefore, Cummings was not ineffective for failing to find another mental health expert.
Cummings simply was not ineffective for failing to seek another mental health expert's evaluation of defendant Looney after Dr. Partyka concluded that Looney was a psychopath. This Court has held that defense counsel is not ineffective for deciding not to seek an additional mental health evaluation after receiving an extremely unfavorable evaluation such as occurred here. See Dufour, 905 So.2d at 56 ("[T]rial counsel was not ineffective simply because after receiving an initial unfavorable report from Dr. Gutman they did not proceed further to seek additional experts for mental mitigation evidence."). Cummings was not ineffective in relying on Dr. Partyka's assessment of the defendant and in choosing not to present a mental health expert at the penalty phase in light of that assessment.
As recognized by the trial court, defense counsel Cummings "made a strategic and reasonable decision not to present [mitigation] through a mental health expert." Therefore, Cummings was not ineffective in failing to present the testimony of a mental health expert at the penalty phase, and his decision not to do so does not undermine our confidence in the proceedings below.

Failure to Present Mitigation Convincingly
Looney asserts that Cummings was ineffective for failing to present the available mitigation in an effective manner. He argues that Cummings did not specifically mention any statutory mitigator in his opening or closing statements to the jury at the penalty phase. Looney also stresses that the State enumerated six aggravating factors during its opening statement at the penalty phase that it intended to present to the jury. Looney alleges that Cummings should have enumerated each mitigator individually and secured a jury instruction on each of them in that manner so as to have presented a picture of more mitigators than the aggravators advanced by the State.
*1030 In the order denying postconviction relief, the trial court addressed the issue of enumerating the mitigators and concluded:
Even if the mitigation evidence presented had been enumerated as argued on postconviction relief, it has been repeatedly held by appellant [sic] majorities that a laundry list of enumeration of mitigation aspects or factors relating to a defendant's character, record and background is not required to supplant the standard Section 941.141(6)(h) approved jury instruction form. As has been indicated such a specific enumeration may create real risk of misleading a jury into not considering some mitigation aspect with respect to a defendant's background, character, or record that it has heard because it has not been included in any enumeration. The mitigation presented would not have been provided any more impact or weight for its consideration if it had been teased or parsed into tiny bits and given multiple enumeration for multiplicative matching purposes against the State's aggravators. The jury was not left with the impression that the mitigation they could consider was limited nor that mitigation not specifically designated as statutory could not impact or be weighed against the State's statutory aggravators. Contrary to defendant's assertions that his case went to the jury with no statutory mitigators and only a grouping of nonstatutory mitigation, his case went to the jury with two statutory mitigators and a host of further nonstatutory mitigation. Furthermore, counsel made it clear and ably argued that any mitigator could outweigh all of the aggravators argued by the State.
With respect to Looney's general argument regarding the method in which trial counsel presented mitigation, the methods Cummings selected would be considered trial strategy. This Court has established that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Howell v. State, 877 So.2d 697, 703 (Fla.2004) (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000)). Cummings testified at the evidentiary hearing that he attempted to convey Looney's sad background through the witness testimony available to him. Explaining his decision to present Looney's background in this manner, Cummings testified that he presented the mitigation as he did "[t]o try to paint the picture the best we could of what Jason had been through with the individuals that were willing to cooperate." After weighing all the postconviction testimony, the trial court did not find Cummings' performance ineffective and we agree.

CONCLUSION
Looney has failed to meet his burden under Strickland. All of the additional mitigators that Looney asserts were not presented during the penalty phase were either presented or not presented because defense counsel had no indication that the mitigating factor might apply to Looney's case. Defense attorney Cummings reasonably relied on the evaluation of the mental health expert in making a strategic decision not to call a mental health expert as a witness. Additionally, even if the mitigation had been presented in the manner proposed by Dr. Mosman during his testimony at the evidentiary hearing, the trial court found Dr. Mosman to be an unconvincing witness. Based on the foregoing, Cummings provided effective assistance of counsel and none of the testimony presented by Looney at the postconviction evidentiary hearing undermines our confidence in the proceedings below. Therefore, *1031 we affirm the denial of Looney's postconviction motion under rule 3.851.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The State's first witness, Reginald Byrd, was a probation officer who testified that codefendant Hertz was in violation of his probation on the date of the murders.
[2] In its opinion affirming the convictions, this Court detailed Looney's direct appeal claims as follows:

(1) The trial court improperly excused for cause a venire member whose opposition to the death penalty did not prevent or substantially impair her ability to perform her obligations as a juror; (2) the details of the collateral crimes in Volusia county became a feature of the trial causing prejudice that substantially outweighed the probative value of the evidence; (3) the trial court erred by admitting gruesome photographs of the bodies at the crime scene and the autopsy; (4) the trial court erred by refusing to grant a mistrial after the State's witness testified about the hearsay statement by a nontestifying codefendant which incriminated Looney; (5) the evidence was insufficient as a matter of law to sustain the convictions; (6) the trial court erred in denying the defense motion to require a unanimous verdict; (7) the statute authorizing the admission of victim impact evidence is an unconstitutional usurpation of the Court's rulemaking authority under article V, section 2, of the Florida Constitution, making the admission of such testimony unconstitutional and reversible error; (8) four of the seven aggravating factors upon which the jury was instructed and which the trial court found are legally inapplicable and their consideration was not harmless error; and (9) the death sentence in this case is disproportionate.
Looney, 803 So.2d at 664 n. 2.
[3] This motion raised the following claims: (1) Florida's death penalty violates the sixth and fourteenth amendments to the United States Constitution and the corresponding provisions of the Florida Constitution because of principles announced in the United States Supreme Court decisions in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (2) penalty phase counsel was ineffective for asserting as nonstatutory mitigation issues which should have been asserted as statutory mitigation; (3) trial counsel failed to object to inadmissible evidence, allowed damaging evidence to be introduced by hearsay, allowed damaging evidence and testimony to be introduced without proper foundation, failed to present relative and critical testimony during the guilt phase, failed to prepare and properly preserve argument for a directed verdict, failed to consult with and advise the defendant of his trial rights, and was generally ineffective in his representation; and (4) counsel was ineffective for failing to proceed with a motion for a venue change of a high profile case in a small county.
[4] Huff v. State, 622 So.2d 982 (Fla.1993).
[5] Looney withdrew his original claim four, regarding the venue change. Looney and the State stipulated that the only claim requiring an evidentiary hearing was the issue raised in the amended rule 3.851 motion pertaining to the ineffectiveness of trial counsel during the penalty phase for failing to present extant mental health mitigation. In the order denying the rule 3.851 motion, the trial court summarily denied all of Looney's claims except the claim relating to the mental health mitigation presented during the penalty phase, which is the subject of the current appeal.