# Supreme Court of Florida

_____

No. SC12-1041
_____

**ROBERT J. BAILEY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[August 28, 2014]

PER CURIAM.

This case is before the Court on appeal from a final order denying Robert J. Bailey, Jr.'s, amended motion pursuant to Florida Rule of Criminal Procedure 3.851 to vacate a judgment of conviction for first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

We reject Bailey's three claims raised in this appeal in which he alleges ineffective assistance of trial counsel. And, because Bailey failed to satisfy the Strickland[1] standard in the postconviction proceeding held below, we affirm the final order appealed in this case.

_____

1. Strickland v. Washington, 466 U.S. 668 (1984).

# I. DIRECT APPEAL

The facts and circumstances pertaining to Bailey's convictions and sentences are taken from our previous opinion concerning his direct appeal:

Robert J. Bailey was indicted for resisting a police officer with violence and first-degree murder in the shooting death of Sergeant Kevin Scott Kight, which occurred after Sergeant Kight stopped Bailey for a traffic infraction.

On March 26, 2005, Robert Bailey, John Braz, and D'Tori Crawford drove from Chicago to Florida to look for women during spring break. For the trip, Bailey used a white Dodge Durango that his grandfather rented for him. The three men drank beer and smoked marijuana on the way, driving all through the night. Crawford saw that both Braz and Bailey had handguns with them. The men arrived in Pensacola on March 27, but once they arrived, they learned that a recent hurricane had damaged the beaches in Pensacola significantly. After eating lunch at a restaurant, they drove to Panama City and checked into the Sugar Sands Motel. They met a few men from Kentucky, drank some more, and went to a nearby bar called "Sweet Dreams" with a few of the men from Kentucky.

After some time had passed, Bailey and Crawford left the bar in the white Durango to pick up some girls. Traffic was bumper-to-bumper and was moving very slowly. While they were driving, Bailey and Crawford paused to talk to some girls walking down the road, exchanging their phone numbers and hotel room numbers. Bailey and Crawford did not notice that traffic had begun to move until a police officer, Sergeant Kight, pulled them over. Sergeant Kight requested Bailey's driver's license, and after Bailey gave him identification, the officer left, saying that he would be right back. At that point, Bailey started to panic and told Crawford that he did not have a valid license and had a parole violation. He asked Crawford what he thought would happen. Bailey's hand was shaking so badly that he asked Crawford to call his girlfriend for him. Crawford heard Bailey tell his girlfriend that he was being pulled over by a cop and was going to need her to pick him up because Bailey would "pop this cop" if the officer tried to arrest him. Bailey then reached under the driver's seat to retrieve a handgun, placing it under his right leg. Bailey's face was red, and he had tears in his eyes. Crawford tried to

calm Bailey down, but Bailey told Crawford that he was not going back to jail again. Crawford refused to be a part of the plan, and when he noticed that the officer was looking down, Crawford got out of the vehicle, blending in with a crowd of people who were walking by. Crawford barely knew Bailey and did not warn the police officer because he was afraid that if he approached the officer, Bailey would shoot him too.

While Bailey was being pulled over, a number of people in other vehicles were watching the events, particularly since traffic was barely moving. As Hillary Chaffer drove by, she noticed that Bailey tried to pull forward while the officer was looking down. Sergeant Kight approached Bailey's vehicle again, removing his handcuffs from his belt. Bailey stuck his gun out the window and fired it three times at the officer. Two of the bullets hit the officer, and the other bullet hit a passing van and lodged in the door of the van. Bailey sped off in his vehicle, while Sergeant Kight radioed dispatch that he had been shot. Many other officers were close by at the time of the shooting. . . .

. . .

During the trial, the State presented the testimony of Crawford, who testified about the trip and the circumstances before and after the shooting. Crawford, however, was not present when the police officer was shot. The State presented two eyewitnesses to the shooting: Hillary Chaffer and Jarrod Schalk. Both witnesses were driving past Bailey when he shot Sergeant Kight, and both identified Bailey as the person who shot the officer. Hillary Chaffer testified that when she passed the white Durango that was pulled over, she saw only Bailey in the vehicle, and he looked very pale and very scared. When she first heard the gunshots, she was facing forward but quickly turned around and saw Bailey with a gun in his hand before he drove away. Jarrod Schalk was the other eyewitness who testified at trial. He was riding in a van as a passenger and began to watch the officer who pulled over a white Durango. He also testified that he saw only Bailey inside the vehicle. As the officer approached Bailey with handcuffs in his hand, Schalk told his friends they were about to see somebody get arrested. Schalk noticed that Bailey's face looked really mean and upset. Bailey suddenly pointed a gun, and Schalk saw the fire from the gun before he ducked. One of the bullets hit the van in which Schalk was riding. Lawson testified for the State and detailed how Bailey jumped in the back of his truck after the shooting, admitted that he had

"popped a cop," showed them the gun, and instructed the occupants to take him to a particular bar named Sweet Dreams.

Numerous officers and investigators also testified about the evidence found during the investigation. Officer Clayton Jordon testified that Bailey's identification was found still clipped to Sergeant Kight's citation book holder when they arrived at the scene. . . . The two bullets that struck the officer went through the top portion of the officer's bullet-proof vest and, based on a downward trajectory, hit his heart, liver, and kidney. Both of the wounds were fatal, and Sergeant Kight would have quickly lost consciousness within about a minute.

. . . The jury found Bailey guilty of murder in the first degree with a firearm and guilty of resisting an officer with violence.

The penalty phase began the next day. During the penalty phase, the State introduced evidence that Bailey was on parole in Wisconsin at the time of the crime and that on March 9, 2005, Bailey's supervising parole agent placed Bailey on home detention and later sought a warrant requesting Bailey's arrest. At that point, the State rested. Bailey called one witness: Dr. Larry Kubiak, who was a licensed psychologist. Dr. Kubiak testified that Bailey had numerous problems, including attention deficit hyperactivity disorder (ADHD), some very significant neuro-cognitive deficits that would be consistent with significant brain damage, post-traumatic stress disorder, severe alcohol and drug abuse, depression, and a number of personality disorders including "depressive personality disorder with anti-social features, dependent personality disorder with negativistic features, and borderline personality disorder with schizotypal features." . . .

. . . The State also called in rebuttal Dr. Greg Prichard, who provided conflicting testimony as to whether Bailey had borderline mental retardation. Dr. Prichard opined that Bailey had average intelligence, and his low test results could be based on malingering. The State's expert disagreed with Dr. Kubiak's conclusions regarding statutory mental mitigation, and according to Dr. Prichard, Bailey chose to shoot the officer so that Bailey could do what he wanted to do and that Bailey had a very realistic understanding of what would happen. The State introduced a second expert, Dr. Harry McClaren, who came to the same conclusions as Dr. Prichard and emphasized how Bailey planned the murder shortly before it happened and took clear actions afterwards to avoid being arrested. Finally, the State reintroduced Randy Squire, who intercepted and recorded a telephone

- 4 -

conversation that Bailey had with his friend Braz, where Bailey told Braz that he was "playing all [his] little cards" to make sure that he was found incompetent and encouraged his friend to start talking to walls if Braz wanted to stay out of jail too.

By a vote of eleven to one, the jury recommended that the death penalty be imposed. After holding a [hearing in accordance with Spencer v. State, 615 So. 2d 688, 690-91 (Fla. 1993)], the circuit court sentenced Bailey to death, finding two aggravating circumstances which were given great weight, rejecting the two statutory mental mitigators, and finding a number of other mitigating circumstances which the court found were entitled to little weight. Bailey raises three claims:

(1) whether the death penalty is disproportionate; (2) whether the prosecutor committed fundamental error by allegedly making inappropriate remarks before the jury; and (3) whether Florida's capital sentencing procedures are unconstitutional.

Bailey v. State (Bailey I), 998 So. 2d 545, 547-51 (Fla. 2008) (footnotes omitted).[2]

---

2. The trial court found the following aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or probation (given great weight); and (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody (also given great weight). See Bailey I, 998 So. 2d at 551.

The trial court also made findings about the following statutory mitigating circumstances: (1) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (not reasonably established by the evidence); (2) the crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance (not reasonably established by the evidence); (3) the defendant, born on July 15, 1982, was 22 years old at the time of the crime (given very little weight). Id. at 551-52.

The trial court found the following non-statutory mitigating factors: (1) defendant has a low I.Q. (given little weight in light of no expert declaring defendant to be intellectually disabled); (2) defendant has a history of mental health problems from early childhood (given little weight); (3) defendant spent time in a juvenile facility for troubled youth (given little weight); (4) defendant

## II. INITIAL POSTCONVICTION PROCEEDING

In April 2011, Bailey filed a Complete Amended Motion for Post Conviction Relief in accordance with Florida Rule of Criminal Procedure 3.851.[3] The court below ultimately heard Bailey's arguments for postconviction relief and on June 23, 2011, entered a final order denying Bailey's amended rule 3.851 motion. This appeal followed.

was intoxicated at the time of the crime (given little weight); (5) defendant came from a broken home (given little weight); (6) defendant was a poor student in grade school who was diagnosed with attention deficit hyperactivity disorder (ADHD), although he was continually promoted in Milwaukee public schools (given little weight); (7) defendant showed concern for Sgt. Kight when he was arrested (given little weight); and (8) defendant was very respectful during all of his court appearances and has adjusted well to incarceration (given little weight). Id. at 552.

3. In his amended rule 3.851 motion, Bailey sought relief on eight grounds: (1) trial counsel was ineffective for failing to use peremptory strikes on one or more biased jurors (Ground I); (2) due process violation for failure of trial court and counsel to adequately voir dire prospective jurors regarding pretrial publicity (Ground II); (3) trial counsel was ineffective for failing to formulate a defense theory (Ground III); (4) trial counsel was ineffective for failing to attack one of the two statutory aggravators argued by the State (Ground IV); (5) penalty phase counsel provided ineffective assistance by failing to call family witnesses and present photographs and records of the defendant as a child, and instead limited the presentation of mitigating evidence to only one "expert" witness who was impeached by the State (Ground V); (6) the State's lethal injection procedures are unconstitutional (Ground VI); (7) ineffective assistance of counsel for failing to call former attorney Walter Smith to impeach State's expert witness regarding the Defendant's mental retardation (Ground VII); and (8) ineffective assistance of counsel for failing to call Dr. Jill Rowan to testify regarding her findings of mental retardation, and failing to obtain an MRI, CAT scan, or PET scan of the defendant's brain (Ground VIII).

Bailey raises three issues on appeal. First, Bailey argues that trial counsel was ineffective for failing to use one of the remaining peremptory strikes on an allegedly biased juror. Second, Bailey argues that trial counsel was ineffective for failing to adequately voir dire prospective jurors regarding negative pretrial publicity. Bailey further argues that the inadequate voir dire of the prospective jurors resulted in the violation of his constitutional right to due process under the law. Finally, Bailey argues that trial counsel was ineffective for relying on expert testimony to the exclusion of testimony from his family and other lay witnesses who had knowledge of mental health mitigation that casts doubt on the appropriateness of the death sentence.

### III. ANALYSIS

In order for a defendant to obtain relief based on an allegation of ineffective assistance of counsel, there must be a showing that satisfies the two-pronged analysis set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In capital appeals in which an appellant claims that trial counsel was ineffective, we have previously explained our application of the <u>Strickland</u> standard:

> A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Occhicone v. State, 768 So. 2d 1037, 1045 (Fla. 2000) (quoting Maxwell v. Wainright, 490 So. 2d 927, 932 (Fla. 1986)).

### A. Standard of Review

This Court's standard of review is two-pronged:

(1) this Court must defer to the circuit court's findings on factual issues so long as competent substantial evidence supports them; but (2) must review de novo ultimate conclusions on the deficiency and prejudice prongs. Reed v. State, 875 So. 2d 415, 421-22 (Fla. 2004) (citing Stephens v. State, 748 So. 2d 1028, 1033 (Fla. 1999) ("Thus, under Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's factual findings.")).

Everett v. State, 54 So. 3d 464, 472 (Fla. 2010).

### B. Merits

### 1. Biased Juror Claim

### a. Deficiency

Counsel's performance cannot be found deficient under the Strickland standard when counsel's actions stem from a reasonable trial strategy. See Occhicone, 768 So. 2d at 1048 ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.") (citing Rutherford v. State, 727 So. 2d 216, 223 (Fla. 1998); State v. Bolender, 503 So. 2d 1247, 1250 (Fla. 1987)).

- 8 -

The record shows that although counsel initially made an unsuccessful for cause challenge concerning the seating of Juror Linda Good, upon further consideration and after the State rehabilitated her from earlier statements that she made, defense counsel reasonably believed it would be useful to have Juror Good remain on the jury. See Evans v. State, 995 So. 2d 933, 942 (Fla. 2008) ("Although [the juror] clearly supported the death penalty and initially indicated that a case of self-defense would be the only time she would recommend life, she immediately confirmed that she would listen to the judge's instructions, 'consider all circumstances' and follow the law. Based on her clear confirmation of her ability to follow the law and counsel's belief that she would be a good guilt-phase juror, counsel's decision not to challenge [the juror] was reasonable and a matter of trial strategy.") (citing Dufour v. State, 905 So. 2d 42, 54-55 (Fla. 2005)).

Former defense counsel testified during the postconviction evidentiary hearing that Bailey's defense team formed a trial strategy of seeking second-degree murder, which weighed the potential benefits versus any risks of keeping Juror Good on the jury. Former defense counsel Gontarek, referencing Juror Good, testified that: "[A] jury selection process is not what a person says but their eye contact with the defendant or with Mike Flowers [co-defense counsel] or myself or their body language, things like that." Another important component of the defense team's decision to keep Juror Good arose when counsel informed him

- 9 -

about the pros and cons of not using a peremptory challenge to remove this juror and Bailey informed his lawyers that he wanted to keep Juror Good because "he liked her very much."

We, therefore, conclude that the strategic decision by Bailey's trial counsel not to use a peremptory challenge to remove Juror Good from the jury was reasonable under the circumstances. See Cole v. State, 841 So. 2d 409, 415 (Fla. 2003) (finding no error in the trial court's determination that under the circumstances in which the defendant insisted on keeping an identified juror, trial counsel's decision not to peremptorily challenge said juror did not constitute deficient performance under the Strickland standard) (citing Occhicone, 768 So. 2d at 1048 and Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.")).

Sufficient evidence existed in the postconviction record for the circuit court to find that counsel's decision not to exercise one of its remaining peremptory challenges to remove Juror Good was part of a reasonable trial strategy, and the circuit court did not err in reaching this legal conclusion. "The evidence is sufficient when it is both competent and substantial." Caylor v. State, 78 So. 3d 482, 497 (Fla. 2011) (citing Mansfield v. State, 758 So. 2d 636, 646 (Fla. 2000)). In addition, it is clear from the record that the defense team's decision was in

concert with Bailey's informed consent to keep this juror.  Accordingly, we find that the circuit court's factual findings are supported by competent, substantial evidence in this record on appeal and the court did not err as to its legal conclusion that counsel's performance was not deficient under the Strickland standard.

### b.  Prejudice

Even if it could be shown that defense counsel's strategy with regard to Juror Good was unreasonable, we further find that Bailey failed to establish that he was prejudiced by defense counsel's decision not to use one of its remaining peremptory challenges to remove Juror Good.  We have previously explained that when the convicted person alleges that counsel failed to take steps to remove a biased juror, prejudice must be established by proof that a juror was actually biased.  See Troy v. State, 57 So. 3d 828, 838 (Fla. 2011) ("Because the record refutes any claim of actual bias that would have prevented juror Hamblin from serving as an impartial juror, Troy is not entitled to relief."); Carratelli v. State, 961 So. 2d 312, 327 (Fla. 2007) (requiring a showing of the juror's actual bias).

The record shows that after she initially stated that "the death penalty is not used enough," Juror Good responded to the State's questions during voir dire by subsequently attesting that she could follow the trial court's instructions and that she could absolutely consider all mitigation presented in the case.  Also during voir dire, Juror Good responded in pertinent part by stating: "[A]s a jury member after

- 11 -

hearing the evidence if I find that the person was not mentally stable, you know, other circumstances, I could vote for life." Juror Good further responded that in the event the State proved Bailey was guilty of first-degree murder, it would be the greater weight of the evidence for the circumstances in aggravation or mitigation that would sway her vote concerning the death penalty. The circuit court also noted in its final order that Juror Good agreed she could follow the law, and that she would not allow any pretrial publicity to influence her opinion about Bailey's guilt or non-guilt in Sergeant Kight's murder.

We find that there is competent, substantial evidence in the postconviction evidentiary record supporting the circuit court's finding credibility in Bailey's former defense team's expressed views about Juror Good. The record shows that both of Bailey's former lawyers testified that Juror Good's affirmative statements, under oath, that she could perform her duties as an impartial juror in deciding Bailey's fate, persuaded them that she was not actually biased against their client. And, we find there is otherwise insufficient evidence in this record to establish that Juror Good was actually biased against him. Accordingly, Bailey fails to establish that he was prejudiced under the Strickland standard concerning this issue.

**2. Improper Voir Dire of the Venire**

The circuit court concluded that Bailey's improper voir dire claim is procedurally barred due to his failure to raise it on direct appeal. We agree.

- 12 -

Bailey's failure to raise this improper voir dire claim during his direct appeal renders it a pretext to a bona fide ineffectiveness of trial counsel claim. See Brown v. State, 755 So. 2d 616, 637 (Fla. 2000) ("Brown contends that his guilt-phase counsel was deficient in failing to question a juror as to the extent of her knowledge of a newspaper account of the trial. This claim is procedurally barred in that it should have been raised on direct appeal, and Brown attempts here to circumvent the procedural bar by couching the issue as ineffective assistance of counsel."). Despite Bailey's assertion to the contrary, his improper voir dire claim is procedurally barred for the reasons that we explained in Brown.[4]

### 3. Faulty Reliance on Expert Testimony for Mental Mitigation Claim

### a. Deficiency

It is well established that trial counsel is not ineffective for relying on a qualified mental health expert to provide the defense with assistance during the guilt phase and mitigation evidence for the penalty phase. See Looney v. State, 941 So. 2d 1017, 1027 (Fla. 2006) ("This Court has established that defense

---

4. Even if Bailey could show cause as to why this claim is not procedurally barred, this claim fails to satisfy the Strickland standard for relief from alleged ineffective assistance of trial counsel. First, there is no deficiency because the record shows that counsel took reasonable steps to seat a jury that was amenable to the defense's trial strategies. See Occhiocone, 768 So. 2d at 1048. Second, there is no prejudice because there is no showing in this record that identifies any specific juror for whom there was proof that that juror was actually biased against Bailey. See Carratelli, 961 So. 2d at 327.

counsel is entitled to rely on an evaluation conducted by a mental health expert for trial, even if, in retrospect, that evaluation is less than perfect.") (citing State v. Sireci, 502 So. 2d 1221 (Fla. 1987)).

The circuit court correctly ruled that, based on Dr. Kubiak's well-documented professional background and his experience as a neuropsychologist, Bailey's defense team was not ineffective for relying on Dr. Kubiak as its mental health expert. The circuit court concluded that Bailey's assertion in his postconviction motion that his defense counsel could have chosen a "better" mental health expert was conclusory. The circuit court also concluded that the claim that more evidence of Bailey's mental deficits could have been presented was without merit.

The circuit court also found former defense counsel Gontarek's testimony during the postconviction evidentiary hearing that he invited Ms. Gilchrist (Bailey's mother) and other family members to come and testify for Bailey was more credible than Ms. Gilchrist's testimony to the contrary. During the postconviction evidentiary hearing, Gontarek testified that when he asked Bailey's mother and grandfather to come to Florida and testify at trial, neither of them would agree to do so.

We have long held that a fact-finder's judgment of witness credibility that is supported by competent, substantial evidence, as found in this case, will stand. See

- 14 -

Gonzalez v. State, 990 So. 2d 1017, 1024 (Fla. 2008) (" 'As long as the trial

court's findings are supported by competent substantial evidence, "this Court will

not substitute its judgment for that of the trial court on questions of fact, likewise

of the credibility of the witnesses as well as the weight to be given to the evidence

by the trial court." ' Blanco v. State, 702 So. 2d 1250, 1252 (Fla. 1997) (quoting

Demps v. State, 462 So. 2d 1074, 1075 (Fla. 1984)).").

There is competent, substantial support within the postconviction evidentiary

record for the circuit court's conclusion that Bailey's trial lawyers' actions were

part of reasonable trial strategy, and the circuit court did not err in reaching this

conclusion. Former defense counsel Gontarek testified that he "100 percent

prefers" a psychologist versus a parent to testify about the background of a

defendant facing the death penalty. And, during the postconviction evidentiary

hearing, Gontarek also testified that he believed Dr. Kubiak was a better witness

than Bailey's mother. As we previously stated, it is not ineffective assistance when

trial counsel carries out a reasonable strategy that discriminates between the best

potential witnesses to call. See Everett, 54 So. 3d at 474 ("This Court has also

consistently held that a trial counsel's decision to not call certain witnesses to

testify at trial can be reasonable trial strategy.") (citing Bowles v. State, 979 So. 2d

182, 188 (Fla. 2008) (holding that, after weighing the benefit/risk ratio, counsel's

declination to call a clinical psychologist whose testimony could have provided

- 15 -

emotional disturbance mitigation was consistent with reasonable trial strategy); Arbelaez v. State, 898 So. 2d 25, 39 (Fla. 2005) (holding that trial counsel's failure to call defendant's family members as witnesses during penalty phase was reasonable trial strategy and not ineffective assistance of counsel)).

Regarding Bailey's assertion that Dr. Kubiak inadequately presented key features of Bailey's personal history, the State argues that defense counsel was not deficient in relying on its expert. The State points out that through Dr. Kubiak the defense was able to introduce Bailey's school records, medical records, and other records from certain Wisconsin state agencies—including records from that state's Department of Corrections during the period when Bailey was an inmate serving a felony sentence there. Notwithstanding the State's assertions about this point, the record shows that Dr. Kubiak spent several hours administering various tests on Bailey in order to evaluate his competence, mental health, and mental deficits.

In the postconviction evidentiary hearing, former defense counsel Gontarek admitted during his direct examination that he did not travel to Wisconsin to investigate Bailey's personal history and family background. Gontarek also testified that he was unaware Ms. Gilchrist had assured Bailey's predecessor defense counsel that she would be willing to assist the defense in any way possible. However, Gontarek testified that he interviewed Ms. Gilchrist and Bailey's grandfather by telephone about Bailey's personal history and family background.

- 16 -

Gontarek testified that when Bailey's mother and grandfather expressed unwillingness to travel to Florida to testify during Bailey's trial, he concluded that the mitigation evidence they would have provided could be introduced through Dr. Kubiak at trial.

Bailey argues that his defense counsel was deficient for deciding not to use Bailey's family and other lay witnesses who would have bolstered Dr. Kubiak's testimony. Moreover, Bailey asserts that his mother would have been the best witness for him. The circuit court found insufficient evidence to conclude that trial counsel performed deficiently, finding instead that counsel's decision was strategic. We find that Gontarek's testimony about what transpired during his communication with Ms. Gilchrist and Bailey's grandfather constitutes competent, substantial evidence in the postconviction record. Such testimonial evidence from Bailey's former counsel supports the circuit court's findings, and the circuit court did not err in concluding that counsel employed reasonable trial strategy to avoid the presentation of cumulative mental health mitigation evidence to the jury.

Moreover, the circuit court observed that during the postconviction evidentiary hearing Bailey "did not present any additional evidence concerning [his] mental and psychological conditions and did not call any psychologists to testify" . . . "[i]nstead, [Bailey] presented lay witness testimony at the evidentiary hearing in the form of three family witnesses." Based on the testimony provided

during the postconviction evidentiary hearing, the circuit court found that the lay witnesses that Bailey called "faile[d] to provide any substantial mitigation that was not already introduced by Dr. Kubiak at the penalty phase of [Bailey's] trial."

Although the testimony of a family member about a defendant's mental health will not always be cumulative to the testimony of an expert mental health witness, because in many instances family members may be able to provide compelling testimony regarding mitigating circumstances, we find that in this case there is competent, substantial evidence in the record before us supporting the circuit court's findings. Furthermore, we find that the circuit court did not err in concluding that the lay witness members of Bailey's family would have provided evidence pertaining to mental health and psychological circumstances at trial that was cumulative to the evidence presented to the jury by Dr. Kubiak. "[T]his Court has held that 'even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.' " Lynch v. State, 2 So. 3d 47, 71 (Fla. 2008) (quoting Darling v. State, 966 So. 2d 366, 377 (Fla. 2007) (citing Gudinas v. State, 816 So. 2d 1095, 1106 (Fla. 2002))); see also Trotter v. State, 932 So. 2d 1045, 1052 (Fla. 2006) (affirming the trial court's denial of postconviction relief on the allegation that counsel was ineffective by not presenting Trotter's nieces' irrelevant and cumulative mitigation testimony).

Therefore, the circuit court's conclusion that counsel's performance was not deficient, regarding the declination to call lay witnesses comprised of Bailey's family and friends during the penalty phase, is supported by existing case law. See Jennings v. State, 583 So. 2d 316, 321 (Fla. 1991) (affirming the circuit court's conclusion that counsel was not deficient for deciding not to put on additional testimony to bolster mitigation that was sufficiently proven).

### b. Prejudice

Prejudice is established when a showing of trial counsel's error during the penalty phase undermines our confidence in the defendant's sentence of death. See Wheeler v. State, 124 So. 3d 865, 873 (Fla. 2013) ("Under [the Strickland] standard, a defendant is not required 'to show "that counsel's deficient conduct more likely than not altered the outcome" of his penalty proceeding, but rather that he establish "a probability sufficient to undermine confidence in [that] outcome." ' ") (quoting Porter v. McCollum, 558 U.S. 30, 44, (2009) (quoting Strickland, 466 U.S. at 693-94)). And, as the Supreme Court has held: "[t]o assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence . . .' and 'reweigh[s] it against the evidence in aggravation.' " Id. (quoting Porter, 558 U.S. at 41 (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000))).

Bailey argues that he was prejudiced by not having family members testify at his trial because they would have been able to prove that he suffered from

bipolar disorder and, thereby, humanize him to the jury. Bailey further argues that Dr. Kubiak only established that he had a rule-out diagnosis for bipolar disorder in his mental health history. Dr. Rowan testified on direct examination in a telephonic deposition, explaining how Bailey's rule-out diagnosis for bipolar disorder was accomplished. Dr. Rowan stated that Bailey's medical records showed that previous clinicians had administered bipolar disorder therapy medication, and measured his responsiveness thereto in an attempt to rule out bipolar disorder. Dr. Rowan further testified that there was no record that any clinician had previously diagnosed Bailey with bipolar disorder, nor did she diagnose Bailey with bipolar disorder.

Consequently, the State responded to Bailey's assertion that he was prejudiced by asserting that any mental health mitigation evidence that would have been presented through his family's testimony would have been cumulative to the mental health mitigation evidence presented to the jury by Dr. Kubiak. Based on the evidence in the postconviction record, the circuit court found that in this case, Bailey's family did not provide any mental health mitigation evidence beyond what Dr. Kubiak introduced during Bailey's penalty phase; there was one exception—the circuit court found that testimony about a house fire that severely injured Bailey's mother and younger brother, was not fully developed. Bailey started the house fire when he was five years old.

The circuit court concluded that this single piece of testimonial evidence, even taken as mitigation evidence, would not have outweighed the aggravating factors that were assigned great weight by the trial judge. In addition, the circuit court opined that this evidence "would have likely reinforced [other expert testimony about Bailey's] antisocial and sociopathic behavior." Bailey argues that there was little risk that the jury would have interpreted the house fire event as indicium of the malevolent act of a five-year-old boy.

The record shows that the house fire occurred because young Bailey was left alone while playing with matches in his bedroom. Bailey contends, however, that the evidence about the house fire would have established that afterwards Ms. Gilchrist emotionally abandoned Bailey and, thus, began a cycle of abuse directed at him by his mother that altered the course of his life.

Nevertheless, Bailey fails to show prejudice because the jury did not hear testimony related to the house fire during his trial. The circuit judge weighed the credibility of the witnesses during the postconviction evidentiary hearing and found no mitigating circumstances related to the house fire that shifted the balance of the circumstances in which two aggravating factors were proven and assigned great weight. The circuit court's findings are supported by competent, substantial evidence in the record, and the court did not err in drawing its legal conclusions.

Therefore, we conclude that our confidence is not undermined in the outcome of the penalty phase, because there is no reasonable probability that but for the omission of testimony about the house fire incident, Bailey would have been sentenced to life imprisonment.  See Strickland, 466 U.S. at 700 ("Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."); see also Kilgore v. State, 55 So. 3d 487, 504 (Fla. 2010) (concluding that the defendant failed to demonstrate that the proffered evidence had a reasonable probability of changing the outcome, which is a probability sufficient to undermine confidence in the verdict) (citing Strickland, 466 U.S. at 694); see also Sochor v. State, 883 So. 2d 766, 771 (Fla. 2004) ("In the penalty phase context, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' ") (quoting Strickland, 466 U.S. at 695).  Under the totality of circumstances found in this record, there is insufficient evidence for us to conclude that Bailey was prejudiced simply because the jury did not hear cumulative mental health mitigation evidence, or testimony about the aftermath of a house fire that occurred when he was a youngster.

## IV.  CONCLUSION

Based on this record, we affirm the circuit court court's final order denying Bailey's amended rule 3.851 motion.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
CANADY, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Bay County,
        Michael C. Overstreet, Judge - Case No. 032005CF001093XXAXMX

Clyde M. Taylor, Jr. and Clyde Montgomery Taylor, III, Taylor & Taylor, P.A., St. Augustine, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General and Stephen Richard White, Assistant Attorney General, Tallahassee, Florida,

        for Appellee