786 So.2d 559 (2001)
Ricardo GONZALEZ, Appellant,
v.
STATE of Florida, Appellee.
No. SC94154.
Supreme Court of Florida.
May 10, 2001.
*561 William M. Norris, Coconut Grove, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee.
PER CURIAM.
We have on appeal an order of the trial court reimposing the death penalty upon Ricardo Gonzalez. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the trial court's determination that death is the appropriate sentence in this case.

PROCEDURAL AND FACTUAL BACKGROUND
On February 14, 1992, Ricardo Gonzalez (Gonzalez) was charged in the Eleventh Judicial Circuit of Florida with committing first-degree murder of a law enforcement officer; armed robbery; aggravated assault; two counts of grand theft; and two counts of burglary in connection with a January 3, 1992, bank robbery. Gonzalez was tried jointly with his codefendants, Leonardo Franqui (Franqui) and Pablo San Martin (San Martin). Gonzalez was convicted on all counts and sentenced to death for the murder. This Court previously summarized the facts of this case as follows:
The defendant, Ricardo Gonzalez, along with codefendants Pablo San Martin, Leonardo Franqui, Fernando Fernandez, and Pablo Abreu, were charged with first-degree murder of a law enforcement officer, armed robbery with a firearm, aggravated assault, unlawful possession of a firearm while engaged in a criminal offense, grand theft in the third degree, and burglary. Gonzalez, Franqui, and San Martin were tried together before a jury in May, 1994.
The record reflects that the Kislak National Bank in North Miami, Florida, was robbed by four gunmen on January 3, 1992. The perpetrators made their getaway in two stolen grey Chevrolet Caprice cars after taking a cash box from one of the drive-in tellers. During the robbery, police officer Steven Bauer was shot and killed. Shortly after the robbery, the vehicles were found abandoned two blocks west of the bank.
Approximately two weeks later, Gonzalez was stopped by police after leaving his residence on January 18, 1992. He subsequently made unrecorded and recorded confessions in which he told police that Franqui had planned the robbery, involved the other participants and himself in the scheme, and chosen the location and date for the crime. He said that Franqui had procured the two stolen *562 Chevrolets, driven one of the cars, and supplied him with the gun he used during the robbery. He further stated that Franqui was the first shooter and shot at the victim three or four times, while he had shot only once. Gonzalez indicated that he shot low and believed he had only wounded the victim in the leg. He was subsequently reinterviewed by police and, among other things, described how Franqui had shouted at the victim not to move before shooting him.
Franqui was also questioned by police on January 18, 1992, in a series of unrecorded and recorded sessions. During his preinterview, Franqui initially denied any involvement in the Kislak Bank robbery, but when confronted with the fact that his accomplices were in custody and had implicated him, he ultimately confessed. Franqui stated that Fernandez had hatched the idea for the robbery after talking to a black male, and he had accompanied the two men to the bank a week before the robbery actually took place. He maintained that the black male friend of Fernandez had suggested the use of the two stolen cars, but denied any involvement in the thefts of the vehicles. According to Franqui, San Martin, Fernandez, and Abreu had stolen the vehicles. Franqui did admit to police that he and Gonzalez were armed during the episode, but stated that it was Gonzalez-and not himself-who yelled at the victim to "freeze" when they saw him pulling out his gun. Franqui denied firing the first shot and maintained that he fired only one shot later.
At trial, over the objection of Gonzalez, the confessions of codefendants San Martin and Franqui were introduced without deletion of their references to Gonzalez, upon the trial court's finding that their confessions "interlocked" with Gonzalez's own confession.
Gonzalez was convicted on all counts, and after a penalty phase trial, the jury recommended death by a vote of seven to five. The trial court followed the jury's recommendation and sentenced Gonzalez to death. Gonzalez raises the following issues on appeal: (1) the trial court erred in denying Gonzalez's peremptory challenges of jurors Diaz and Andani; (2) the trial court erred in denying Gonzalez's motion for severance based upon the introduction of the confessions of nontestifying codefendants Franqui and San Martin at their joint trial; (3) Gonzalez was denied an impartial hearing at his penalty phase because of the court's refusal to sever his case and to permit him to cross-examine San Martin's experts; and (4) his death sentence is disproportionate.
Gonzalez v. State, 700 So.2d 1217, 1217-18 (Fla.1997).
On direct appeal, this Court held that the trial court's decision to deny the challenges to prospective jurors Diaz and Andani was not clearly erroneous, and that the admission of statements by Gonzalez's codefendants, Franqui and San Martin, was harmless during the guilt phase but detrimental to Gonzalez during the penalty phase. Thus, we affirmed Gonzalez's conviction but vacated his death sentence and remanded for a new penalty phase proceeding. Id. at 1219. The State and Gonzalez filed for certiorari with the United States Supreme Court; both petitions were denied. See Florida v. Gonzalez, 523 U.S. 1145, 118 S.Ct. 1856, 140 L.Ed.2d 1104 (1998); Gonzalez v. Florida, 523 U.S. 1062, 118 S.Ct. 1393, 140 L.Ed.2d 652 (1998). A new penalty phase was held on August 10, 1998.
At the resentencing, several witnesses testified for the State, including the tellers who were with Officer Bauer the morning of his murder; officers who arrived at the *563 scene after the shooting to gather evidence and render emergency assistance to the victim; detectives who questioned the suspects and obtained both oral and taped statements from Gonzalez describing his role in the crimes leading to Officer Bauer's death; and doctors who, after examining Officer Bauer, determined that the fatal heart injury he had sustained was inflicted by the .38 revolver that Gonzalez admitted to possessing during the crime.
Gonzalez presented the testimony of several witnesses to substantiate his claims for mitigation. Family members testified Gonzalez has a history of migraine headaches; has always been law-abiding; is a member of loving, supportive households; and is well educated and religious. The testimony of three doctors was also presented. The prior testimony of Dr. Wagschul, a board certified neurologist, was read to the jury. Dr. Wagschul testified concerning head injuries Gonzalez received, including injuries during boxing. As a result of his examination and the information received, Dr. Wagschul diagnosed Gonzalez as suffering from pugilistic encephalopathy. However, on cross-examination Dr. Wagschul stated Gonzalez performed normally on all the neurological tests. The trial court also allowed the testimony of Dr. Fisher who had done research and a thesis on future dangerousness. Dr. Fisher indicated Gonzalez was not psychotic, had no major mental disturbance, was not retarded, did not use drugs or alcohol, and did not show signs of suffering damage as a result of boxing. This expert opined that Gonzalez would make a good adjustment to prison. Dr. Hyman Eisenstein, a neuropsychologist, opined that Gonzalez was under extreme mental or emotional distress at the time he committed the offenses and committed the crimes to get money to make his wife happy.
The trial court sentenced Gonzalez to death, finding six aggravating factors, which were merged into three factors: prior violent felonies based on the contemporaneous convictions for armed robbery and aggravated assault; murder committed during a robbery/murder committed for pecuniary gain; and murder committed to avoid a lawful arrest/victim a law enforcement officer performing his duties/murder committed to hinder enforcement of laws. These aggravating circumstances were found to outweigh the following mitigating circumstances: no significant prior criminal history; brain damage, learning disability and below-average intelligence; remorse; cooperation with authorities; life sentences given to two codefendants; and good conduct while incarcerated and potential for rehabilitation. The trial court considered but rejected the statutory mental health mitigators, as well as the minor participation mitigator. The nonstatutory mitigator of family background was likewise rejected.
In this appeal Gonzalez contends: (1) this Court improperly used a harmless error analysis based on the hearsay rule rather than one based on the confrontation clause to determine whether or not the admission of codefendant statements was proper during Gonzalez's trial; (2) using the victim's status as a police officer as an aggravator as well as to increase the penalty for homicide from twenty-five years without eligibility for release to life without parole constitutes impermissible doubling; (3) substantial organic and behavioral support existed for the expert opinion that was erroneously rejected by the Court when it considered the mental distress mitigator; (4) prosecutor's passionate closing and impermissible personal statements were error; and (5) proportionality analysis requires that Gonzalez's death sentence be vacated.

*564 DISCUSSION

Harmless Error Analysis Used By the Supreme Court
Gonzalez contends this Court used a hearsay-based harmless error analysis rather than a confrontation clause analysis in reviewing the trial court's admission of his codefendants' inculpatory statements during his initial trial. On direct appeal, Gonzalez argued the trial court's admission of these statements was error. This Court found harmful error occurred in the penalty phase of his trial,[1] but that the error was harmless in the guilt phase. See Gonzalez, 700 So.2d at 1219. Thus, this claim is procedurally barred since it was addressed by this Court on direct appeal of Gonzalez's original case and is the law of the case. See Turner v. Dugger, 614 So.2d 1075, 1078 (Fla.1992) (claims procedurally barred if they, or variations thereof, were raised on direct appeal).[2]

Impermissible Doubling of Police Officer's Status Used to Increase the Penalty for Murder and As An Aggravator
Gonzalez claims that using the victim's status as a police officer as an aggravating factor and as a reason to change the possible sentence from life with eligibility for parole to life without parole constitutes impermissible doubling. As the State contends, this issue has not been preserved for appellate review since it was not presented to the trial court. There was no objection made at the resentencing hearing to consideration of the officer's status as an aggravating factor. See Larzelere v. State, 676 So.2d 394 (Fla.1996).[3]

Psychological Mitigators
Gonzalez next contends the trial court erred in rejecting the statutory mitigating factor that he committed the murder while he was under extreme mental or emotional disturbance. On the other hand, the State responds that the trial court examined all the evidence regarding this mitigator and simply found that it was not established by the evidence. Gonzalez's claim on this issue is refuted by the record. The trial court, in a detailed order, specifically addressed and evaluated the testimony of each witness who testified for Gonzalez regarding the psychological aspects of his character and, in the end, found little substantiation for Gonzalez's claim of mental distress during the commission of this crime.
This Court has long held that a trial court in its written order must evaluate each mitigating circumstance offered by the defendant. In Campbell v. State, 571 So.2d 415, 419 (Fla.1990), we said, "When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence ...." See also Zack v. State, 753 So.2d 9, 18 (Fla.2000). Furthermore, in order to be sustained, the court's findings must be supported by *565 competent, substantial evidence in the record. See Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.1981). In Zack, the defendant complained the trial court failed to consider a list of mitigating circumstances. After reviewing the sentencing order, we determined the factors were in fact discussed and referenced in the order with each mitigating factor properly set forth. See 753 So.2d at 20. That finding is similarly applicable in this case.
During resentencing, the testimony of three doctors, Dr. Wagschul, a neurologist, Dr. Fisher, a clinical forensic psychologist, and Dr. Eisenstein, a neuropsychologist, was presented. The work of another doctor, Dr. Nadich, was also discussed. The sentencing order references the evidence presented by each of these physicians. The trial court relied on Walls v. State, 641 So.2d 381 (Fla.1994), as a guidepost in evaluating the expert testimony of each of the experts, particularly Dr. Eisenstein, whose testimony was most favorable to Gonzalez. In Walls we said:
[A] distinction exists between factual evidence or testimony, and opinion testimony. As a general rule, uncontroverted factual evidence cannot simply be rejected unless it is contrary to law, improbable, untrustworthy, unreasonable or contradictory. E.g., Brannen v. State, 94 Fla. 656, 114 So. 429 (1927). This rule applies equally to the penalty phase of a capital trial. Hardwick, 521 So.2d at 1076.
Opinion testimony, on the other hand, is not subject to the same rule. Brannen. Certain kinds of opinion testimony clearly are admissibleand especially qualified expert opinion testimonybut they are not necessarily binding even if uncontroverted. Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking.

Walls, 641 So.2d at 390 (emphasis added).
Dr. Eisenstein, a neuropsychologist, reviewed Gonzalez's school records, medical records, police reports, and confession. He also interviewed Gonzalez concerning his family history. In addition, Eisenstein gathered information concerning Gonzalez's motor functions, sensory perceptions, language ability, intelligence, and personality traits through a variety of tests. On most of these tests, Gonzalez scored in the normal range. However, personality tests did show that Gonzalez was nervous, shy, and introverted and that he possessed minimal socialization skills. Language tests indicated Gonzalez ranged from normal on the fluency tests to profoundly impaired on the naming test to mildly retarded on reading articulation. On the WAIS R test, Gonzalez's full range IQ was found to be 80, the lower average range. However, his school records indicated an IQ of 75 at age 12. Dr. Eisenstein stated Gonzalez responded to the stress of incarceration, his trial, and his marriage. Based on these results, Dr. Eisenstein concluded that Gonzalez acted impulsively in killing Officer Bauer. He also opined that Gonzalez was under extreme emotional and mental distress at the time of the crime due to his having been raised in both the United States and Puerto Rico, his language deficits, his learning disability, pressure from his wife to make more money, and his brain injury.
According to the trial court, Dr. Eisenstein's findings were not supported by Gonzalez's own confession, which showed a lack of impulsivity. Gonzalez was aware the robbery was being planned several days in advance of its execution, and even drove early to the bank with the other codefendants to ensure they would be the first "customers" there. The planning and *566 "laying in wait" contradict the doctor's opinion that impulsiveness caused Gonzalez to kill Officer Bauer. The fact that Gonzalez had his gun drawn as he approached the bank employees also belies the contention that his actions were impulsive.
The trial court went on to find that despite Gonzalez's brain damage, which was proven by the MRI testing Dr. Nadich performed showing evidence of pugilistic encephalopathy, his learning disabilities, and life stresses, Gonzalez had managed to conform his life to the law each day until January 3, 1992. As the trial judge pointed out in his order, Dr. Eisenstein's testimony was further weakened by the testimony of Dr. Wagschul. The deposition of Dr. Wagschul was read at the resentencing. Dr. Wagschul, a neurologist, diagnosed Gonzalez as having pugilistic encephalopathy, a condition common in boxers characterized by the filling of brain cavities with spinal fluid. He stated this condition could cause sudden changes in mood and behavior, but acknowledged that the literature he had read did not show a link between that illness and the commission of robbery or murder. Furthermore, Dr. Wagschul testified that Gonzalez had not suffered neurological difficulty as a result of this brain injury. Wagschul opined that although Gonzalez's brain injury could lead to impulsiveness, it would not cause someone to rob a bank and kill a police officer.
The trial court also noted that Gonzalez's attempts to establish that brain damage affected his conduct was further undermined by the testimony of another expert, Dr. Fisher. Dr. Fisher, a clinical forensic psychologist who had developed a system for predicting future dangerousness, also testified. He examined Gonzalez and found that he was not psychotic, had no major mental disturbance, was not retarded, and did not use drugs or alcohol.
In the final analysis, the evidence presented did not show that Gonzalez had a mental impairment that caused him to behave in this manner. After closely analyzing the testimony of the witnesses Gonzalez presented, the trial court found that Gonzalez had not sufficiently established evidence of psychological problems that would have affected his behavior when the murders were committed. See Walls v. State.
The written sentencing order shows that the trial judge adequately considered the evidence presented in mitigation. The testimony of Dr. Eisenstein that Gonzalez's pugilistic encephalopathy may have caused him to commit murder was refuted by the opinions of Dr. Wagschul and Dr. Fisher as well as evidence that Gonzalez had been law-abiding until the day of the crime. Given the detailed analysis provided by the trial court, this claim by Gonzalez is meritless.
Although the trial court found the statutory mental mitigators had not been established by the evidence, the evidence was sufficient to establish nonstatutory mitigation. The trial judge said:
Although the testimony of the defense witnesses did not establish the statutory mitigating circumstances, the court finds that the defendant's brain damage, learning disability and below average intelligence have been reasonably established and constitute a non-statutory mitigating circumstance. In addition, witnesses testified that the defendant has suffered migraine headaches since boyhood. Regardless of those physical problems, the defendant was able to work, marry, comply with the law, and contribute to society in spite of these deficiencies. Accordingly, the court *567 gives this mitigating circumstance little weight.
It is clear from the sentencing order that the trial court considered, evaluated and weighed all the mental health evidence submitted in mitigation. Error in failing to find the statutory mental mitigators has not been demonstrated.

Prosecutor's Comments
Gonzalez contends the prosecutor's comments during closing argument inflamed the passions of the jury. The State maintains the comments to which Gonzalez refers either were not objected to, were remedied by curative instructions, or constituted proper comments on the evidence. In order for a prosecutor's comments to be deemed prejudicial, they must "vitiate the trial or so poison the minds of the jurors that Appellant did not receive a fair trial." Harris v. State, 742 So.2d 835, 839 (Fla. 2d DCA 1999); See King v. State, 623 So.2d 486 (Fla.1993).
In Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985), this Court outlined the proper parameters of a prosecutor's argument:
The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.
Gonzalez contends that the prosecutor exceeded the parameters outlined in Bertolotti. Gonzalez points to three instances where the prosecutor allegedly inflamed the passions of the jury with inappropriate comments during his closing argument.
Gonzalez first contends that while discussing his duress argument, the prosecutor mocked the defense experts. The prosecutor pointed out that Gonzalez did not mention being pressured by his wife into participating in this crime when initially questioned by police. It was not until Gonzalez spoke with the defense experts that he claimed duress. The prosecutor then said:

They hire a doctor, their own hired gun. Said, look at my guy, I need something to go talk to that jury about. He says, well, my wife wanted me to do this. Does the doctor say, why didn't you just get a job like everybody else in the universe? Why didn't you work a little bit harder? Nobody ever told you you had to rob a bank and shoot and kill somebody? Well, my wife stressed me. What an interesting excuse. It's everybody's fault, it's everybody's responsibility except for this defendant's responsibility. The truth is, he fired that gun and he took that money because he wanted to keep the money and he wanted to kill the man who was going to stop him from getting the money and for no other reason.
(Emphasis added.)[4] No objection was made by counsel to this argument. Although a motion for mistrial was made after the jury retired to deliberate, this issue was not included in that motion. *568 Since the propriety of the comment was not raised in the trial court, it has not be preserved for appellate review. See Henry v. State, 649 So.2d 1361 (Fla.1994).
Secondly, Gonzalez attacks a statement made by the prosecutor as he attempted to refute one of the mitigation arguments proffered by the defense:
MR. LAESER: You're going to get instructions from the Judge and I'm going to tell you right now, they have nothing to do with the case. The Judge is going to instruct you, for example, you can consider whether or not you think that at the time that the defendant committed this crime, he was unable to conform to the requirements of the law because of some sort of mental problems.

MR. DIAZ (defense counsel): Judge, objection to the form of the argument.
THE COURT: All right. It's just argument, ladies and gentlemen. I will read you the instruction on the law.
MR. LAESER: He was unable to conform his action to the requirements, his obligations under the law. Let's think about that. What a bad coincidence it was that the defendant, now twenty-eight years old, had one moment somewhere around 7:55 in the morning of January 3, 1992 when he could not conform his own actions to the requirements of law. And it was just at that moment that Steven Bauer was in front of him.
(Emphasis added.) As the State points out, Gonzalez objected only to the form of the argument regarding the instructions the jurors would receive from the judge. The objection at trial was not based on the same grounds presently argued by Gonzalez; therefore, it is not preserved. See Henry v. State, 649 So.2d at 1365. In addition, a curative instruction was given to the jurors by the court. When read in context, this comment on the instructions appears to be the prosecutor's attempt to call into question the propriety of the mitigation evidence presented. He in essence said that despite an instruction on mental health mitigators, the evidence presented does not support their existence.
The third comment Gonzalez attacks as improper occurred during the prosecutor's argument imploring the jury to use its common sense in evaluating the evidence presented. The prosecutor said:
You don't need any legal training to be a juror. And frankly, there wasn't much common sense going around in law school as I recall anyway. Common sense is something you don't need any special education for. It's what you use every day to make all of your lifetime decisions. You know what things make sense to you; you know when things seem absolutely foolish. Somebody knocks on your door one day and says, excuse me, I'm a little short on cash, I need twenty dollars, that new Mercedes Benz parked out in front of your house. I'll let you keep that Mercedes Benz if you get [sic] give me twenty dollars in cash. Anybody listening? Anybody who hasn't slammed the door yet? Common sense tells you whatever this is, I'm not in it. It's something crooked, something dishonest and I'm about to get scammed out of twenty bucks. Fifteen people are sitting in front of me and I'd like to believe fifteen people would have slammed that door.

Something strange happened in trial. Two people got on that witness stand. Two people who would have parted with those twenty dollar bills. Dr. Eisenstein and Dr. Fisher. Talk about gullible. We're going to talk about those people a little bit more, but I want you to think about whether or not they used common sense when they approached *569 their evaluations when they testified to you about their findings.

(Emphasis added.) Defense counsel failed to object to this comment at trial. Therefore, it is not preserved for appeal. See Rose v. State, 461 So.2d 84 (Fla.1984). Gonzalez has failed to demonstrate that the comments either individually or collectively amount to fundamental error so as to entitle him to any relief.

Proportionality
Lastly, we address the proportionality of Gonzalez's death sentence pursuant to our constitutional mandate. See art. I, § 17, Fla. Const.; Tillman v. State, 591 So.2d 167, 169 (Fla.1991). The death penalty is reserved for only the most aggravated and the least mitigated of first-degree murders. See Urbin v. State, 714 So.2d 411 (Fla.1998); State v. Dixon, 283 So.2d 1 (Fla.1973). Our proportionality review rests upon recognition that death is a uniquely irrevocable penalty requiring uniformity in its imposition. See Urbin, 714 So.2d at 416-17; Sinclair v. State, 657 So.2d 1138, 1142 (Fla.1995). Thus, this Court must undertake a qualitative review of the particular circumstances of the instant case in comparison to other capital cases and then decide if death is the appropriate penalty in light of those other decisions. See Tillman, 591 So.2d at 169.
Here, the trial court found six aggravating factors: (1) Gonzalez was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (2) the felony was committed while Gonzalez was engaged, or was an accomplice in the commission of, or an attempt to commit or in flight after committing or attempting to commit a robbery; (3) the felony was committed for pecuniary gain; (4) the felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from justice; (5) the murder was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws; and (6) the victim of the capital felony was a law enforcement officer engaged in the performance of his official duties. The court merged aggravators two and three, robbery and pecuniary gain, giving the merged aggravator great weight. Aggravators four, five, and six were also merged and given great weight. Thus, the court found and considered three weighty aggravating circumstances.
On the other hand, the trial court found one statutory mitigator, lack of significant history of criminal activity. Several nonstatutory mitigators were found to be established including Gonzalez's brain damage, learning disability and below average intelligence; Gonzalez's remorse and cooperation with the authorities; life sentences imposed on codefendants Abreu and San Martin; and Gonzalez's good conduct in custody and potential for rehabilitation. The trial court gave each mitigating circumstance little weight.
A review of the record reveals competent, substantial evidence in support of the aggravating circumstances and the rejection of some mitigating circumstances. The resentencing judge clearly outlined all his reasons for considering each factor in his sentencing order. This case is similar to Burns v. State, 699 So.2d 646 (Fla.1997), where the defendant was sentenced to death for the murder of a law enforcement officer. In that case, the avoiding arrest and hindering law enforcement aggravators were found and merged. Again, only the statutory mitigator of no significant criminal history was found. Burns had fewer aggravators than Gonzalez, which were weighed against the same statutory mitigator and insignificant nonstatutory mitigation, and this Court upheld his sentence as proportionate.
*570 In Armstrong v. State, 642 So.2d 730 (Fla.1994), we also addressed a murder which involved the killing of a police officer during the course of a robbery. The same three aggravators that were found here were also found in that case. In Armstrong, the defendant claimed a brain injury but failed to show how it had affected his behavior and presented several nonstatutory mitigators. The same mitigation found in this case was also found in Armstrong, and this Court upheld the death sentence.
Pursuant to Palmes v. Wainwright, 460 So.2d 362, 364 (Fla.1984), a "[p]roportionality review compares the sentence of death with other cases in which a sentence of death was approved or disapproved." Id. at 362. Other defendants who have committed similar crimes have had their death sentences affirmed on appeal as evidenced by the aforementioned cases. Gonzalez's death sentence is proportional and is hereby affirmed.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, LEWIS and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion, in which ANSTEAD, J., concurs.
PARIENTE, J., concurring.
I concur in the affirmance of the death sentence. Our affirmance, however, should not be read as an approval of the prosecutor's closing argument remarks. Rather, these isolated remarks were not objected to, and I agree that in this case the arguments do not rise to the level of fundamental error.
I also write to commend Judge Scola's comprehensive and well-reasoned sentencing order. In particular, Judge Scola's detailed evaluation of the evidence related to statutory mitigation and his explanation as to why he did not find that the testimony established the mitigating circumstance of "under the influence of extreme mental or emotional disturbance" greatly assisted this Court in our review of the death sentence in this case.
ANSTEAD, J., concurs.
NOTES
[1] The codefendants' statements were not used in the resentencing proceeding.
[2] Gonzalez' reliance on the United States Supreme Court's opinion in Lilly v. Virginia, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), does not change the result in this case since this Court's analysis of this issue in Gonzalez v. State, 700 So.2d 1217 (Fla.1997), is consistent with Lilly.
[3] Moreover, the argument being made in this instance does not involve doubling of aggravators. Gonzalez is really complaining that the court can consider the status of the victim as a police officer in determining whether death is the appropriate sentence and in determining parole eligibility when life has been determined the appropriate sentence. The two issues are mutually exclusive.
[4] The underlined portions of the arguments represent the statements the defense now claims constitute improper comments and, therefore, reversible errors. In this instance, the comment was not objected to and thus not preserved for appellate review. We stress, however, that prosecutors should be careful about the language used in these arguments. We certainly do not approve of this type of language. See Barnes v. State, 743 So.2d 1105 (Fla. 4th DCA 1999).