998 So.2d 545 (2008)
Robert J. BAILEY, Appellant,
v.
STATE of Florida, Appellee.
No. SC07-748.
Supreme Court of Florida.
December 18, 2008.
*547 Nancy A. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida for Appellant.
Bill McCollum, Attorney General, Charmaine Millsaps and Stephen R. White, Assistant Attorneys General, Tallahassee, Florida, for Appellee.
PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm both the conviction and sentence.

FACTS
Robert J. Bailey was indicted for resisting a police officer with violence and first-degree murder in the shooting death of Sergeant Kevin Scott Kight, which occurred after Sergeant Kight stopped Bailey for a traffic infraction.
On March 26, 2005, Robert Bailey, John Braz, and D'Tori Crawford drove from Chicago to Florida to look for women during spring break. For the trip, Bailey used a white Dodge Durango that his grandfather rented for him. The three men drank beer and smoked marijuana on the way, driving all through the night. Crawford saw that both Braz and Bailey had handguns with them. The men arrived in Pensacola on March 27, but once they arrived, they learned that a recent hurricane had damaged the beaches in Pensacola significantly. After eating lunch at a restaurant, they drove to Panama City and checked into the Sugar Sands Motel. They met a few men from Kentucky, drank some more, and went to a nearby bar called "Sweet Dreams" with a few of the men from Kentucky.
After some time had passed, Bailey and Crawford left the bar in the white Durango to pick up some girls. Traffic was bumper-to-bumper and was moving very slowly. While they were driving, Bailey and Crawford paused to talk to some girls walking down the road, exchanging their phone numbers and hotel room numbers. Bailey and Crawford did not notice that traffic had begun to move until a police *548 officer, Sergeant Kight, pulled them over. Sergeant Kight requested Bailey's driver's license, and after Bailey gave him identification, the officer left, saying that he would be right back. At that point, Bailey started to panic and told Crawford that he did not have a valid license and had a parole violation. He asked Crawford what he thought would happen. Bailey's hand was shaking so badly that he asked Crawford to call his girlfriend for him. Crawford heard Bailey tell his girlfriend that he was being pulled over by a cop and was going to need her to pick him up because Bailey would "pop this cop" if the officer tried to arrest him. Bailey then reached under the driver's seat to retrieve a handgun, placing it under his right leg. Bailey's face was red, and he had tears in his eyes. Crawford tried to calm Bailey down, but Bailey told Crawford that he was not going back to jail again. Crawford refused to be a part of the plan, and when he noticed that the officer was looking down, Crawford got out of the vehicle, blending in with a crowd of people who were walking by. Crawford barely knew Bailey and did not warn the police officer because he was afraid that if he approached the officer, Bailey would shoot him too.
While Bailey was being pulled over, a number of people in other vehicles were watching the events, particularly since traffic was barely moving. As Hillary Chaffer drove by, she noticed that Bailey tried to pull forward while the officer was looking down. Sergeant Kight approached Bailey's vehicle again, removing his handcuffs from his belt. Bailey stuck his gun out the window and fired it three times at the officer. Two of the bullets hit the officer, and the other bullet hit a passing van and lodged in the door of the van. Bailey sped off in his vehicle, while Sergeant Kight radioed dispatch that he had been shot. Many other officers were close by at the time of the shooting. The first responding officers arrived in less than a minute and tried to administer first aid, but Sergeant Kight was unresponsive and never regained consciousness. He was declared dead at the hospital.
Meanwhile, Bailey drove his vehicle onto a dead-end road that ended at the beach. He abandoned the Durango near some condominiums at the beach and walked back to the road, jumping into the bed of a passing truck. Corey Lawson was one of the people already riding in the back of the truck when Bailey jumped into it. Bailey told Lawson that he had just "popped a cop" and lifted up his shirt so the gun in his waistband was visible. Bailey told them that he needed to get off the street and, after talking to a person on his cell phone, told Lawson to take him to the Sweet Dreams bar. Lawson thought Bailey was acting like a "loose cannon" and was afraid that if he did not follow directions, he would be risking his friends' lives. Lawson told the driver where Bailey wanted to go and let her know that Bailey had a gun. While they were driving to the bar, Bailey told Lawson that he shot the officer because he was wanted and would go to jail for life if he was caught. Bailey said that the only way the police were going to catch him is if they killed him. As soon as they dropped Bailey off at the bar, Lawson and his friends contacted the police and told them that they had been carjacked.
Crawford also caught a ride back to the bar. When he arrived, he found Braz and Bailey already there, arguing. Crawford, Braz, and Bailey went back to the Sugar Sands Motel together, and while at the hotel, Crawford tried calling his family. While he was on the telephone, he heard Braz and Bailey on the patio arguing about getting rid of the guns and bullets. Bailey came back into the room, emptied a box of bullets into his pocket, and left. Braz and *549 Crawford decided not to leave; they knew the police would be coming so they waited for the police to arrive.
When the police arrived, they took Braz and Crawford into custody for questioning. The officers then proceeded to search the area surrounding the hotel. Deputy Donna Land was searching a building west of the motel, and Deputy Jim Jenkins went around the back side of the same building. After walking around a corner, Deputy Jenkins saw Bailey peeking around the far corner of the building, watching Deputy Land, who was walking up the stairs. Bailey was doing something with his hand around his waistline, which Deputy Jenkins could not see clearly. Deputy Jenkins drew his weapon and ordered Bailey to put his hands in the air. Bailey refused to comply, however, and was jerking something with his right hand. Deputy Jenkins became quite anxious and yelled very loudly for Bailey to raise his hands. Other officers arrived, and Bailey finally complied. The officers patted down Bailey and found a fully loaded gun in his waistband. Bailey also had a pocket full of ammunition and a key with a rental car tag on it for a Dodge Durango. After he was arrested, Bailey inquired as to the status of the officer he shot.
During the trial, the State presented the testimony of Crawford, who testified about the trip and the circumstances before and after the shooting. Crawford, however, was not present when the police officer was shot. The State presented two eyewitnesses to the shooting: Hillary Chaffer and Jarrod Schalk. Both witnesses were driving past Bailey when he shot Sergeant Kight, and both identified Bailey as the person who shot the officer. Hillary Chaffer testified that when she passed the white Durango that was pulled over, she saw only Bailey in the vehicle, and he looked very pale and very scared. When she first heard the gunshots, she was facing forward but quickly turned around and saw Bailey with a gun in his hand before he drove away. Jarrod Schalk was the other eyewitness who testified at trial. He was riding in a van as a passenger and began to watch the officer who pulled over a white Durango. He also testified that he saw only Bailey inside the vehicle. As the officer approached Bailey with handcuffs in his hand, Schalk told his friends they were about to see somebody get arrested. Schalk noticed that Bailey's face looked really mean and upset. Bailey suddenly pointed a gun, and Schalk saw the fire from the gun before he ducked. One of the bullets hit the van in which Schalk was riding. Lawson testified for the State and detailed how Bailey jumped in the back of his truck after the shooting, admitted that he had "popped a cop," showed them the gun, and instructed the occupants to take him to a particular bar named Sweet Dreams.
Numerous officers and investigators also testified about the evidence found during the investigation. Officer Clayton Jordon testified that Bailey's identification was found still clipped to Sergeant Kight's citation book holder when they arrived at the scene. Joseph Hall, who worked for the Florida Department of Law Enforcement (FDLE), testified that the two projectiles obtained from the victim were fired from the gun that Bailey possessed when he was arrested. Dr. Charles Siebert, the medical examiner, testified that the stippling pattern on Sergeant Kight's face showed that the weapon was fired approximately eighteen inches away from the victim. The two bullets that struck the officer went through the top portion of the officer's bullet-proof vest and, based on a downward trajectory, hit his heart, liver, and kidney. Both of the wounds were fatal, and Sergeant Kight would have quickly lost consciousness within about a minute.
*550 The State also called Catherine Hanson, who was the dispatcher on the evening of the crime. Sergeant Kight called dispatch when he first stopped Bailey; he requested a license check at 10:25 p.m.; and at 10:30 p.m., he reported that he had been shot. The State called a company representative from Bailey's cellular company to establish that on the night of the murder, two calls[1] were made from Bailey's cellular phone at 10:26 p.m., confirming Crawford's testimony that Bailey talked to his girlfriend shortly before the murder. Finally, the State called Randy Squire, who monitored Bailey while he was incarcerated and reviewed all of his incoming and outgoing mail. Squire found a poem in Bailey's cell room which was written in Bailey's handwriting and described the shooting. The jury found Bailey guilty of murder in the first degree with a firearm and guilty of resisting an officer with violence.
The penalty phase began the next day. During the penalty phase, the State introduced evidence that Bailey was on parole in Wisconsin at the time of the crime and that on March 9, 2005, Bailey's supervising parole agent placed Bailey on home detention and later sought a warrant requesting Bailey's arrest. At that point, the State rested. Bailey called one witness: Dr. Larry Kubiak, who was a licensed psychologist. Dr. Kubiak testified that Bailey had numerous problems, including attention deficit hyperactivity disorder (ADHD), some very significant neuro-cognitive deficits that would be consistent with significant brain damage, post-traumatic stress disorder, severe alcohol and drug abuse, depression, and a number of personality disorders including "depressive personality disorder with anti-social features, dependent personality disorder with negativistic features, and borderline personality disorder with schizotypal features." Dr. Kubiak gave Bailey a score of 20 on a global assessment functioning, which is below that of people in a psychiatric hospital. He also asserted that he did not believe that Bailey was malingering. Finally, Dr. Kubiak opined that Bailey was under the influence of extreme mental or emotional disturbance at the time of the crime, and he believed that Bailey could not fully appreciate the consequences and nature of his actions.
In rebuttal, the State called Nancy Huttelmaier, who worked at the Franklin Alternative Youth Program at the Milwaukee County House of Corrections. She worked with Bailey while he was incarcerated and testified that Bailey did well on numerous tests, obtaining his high school equivalency diploma within about four months after beginning the program. Based on her testing, Bailey's reading level was at the 12.9 grade levela level significantly higher than that testified to by Bailey's mental health expert. The State also called in rebuttal Dr. Greg Prichard, who provided conflicting testimony as to whether Bailey had borderline mental retardation. Dr. Prichard opined that Bailey had average intelligence, and his low test results could be based on malingering. The State's expert disagreed with Dr. Kubiak's conclusions regarding statutory mental mitigation, and according to Dr. Prichard, Bailey chose to shoot the officer so that Bailey could do what he wanted to do and that Bailey had a very realistic understanding of what would happen. The State introduced a second expert, Dr. Harry McClaren, who came to the same conclusions as Dr. Prichard and *551 emphasized how Bailey planned the murder shortly before it happened and took clear actions afterwards to avoid being arrested. Finally, the State reintroduced Randy Squire, who intercepted and recorded a telephone conversation that Bailey had with his friend Braz, where Bailey told Braz that he was "playing all [his] little cards" to make sure that he was found incompetent and encouraged his friend to start talking to walls if Braz wanted to stay out of jail too.
By a vote of eleven to one, the jury recommended that the death penalty be imposed. After holding a Spencer[2] hearing, the circuit court sentenced Bailey to death, finding two aggravating circumstances which were given great weight,[3] rejecting the two statutory mental mitigators,[4] and finding a number of other mitigating circumstances which the court found were entitled to little weight. Bailey raises three claims: (1) whether the death penalty is disproportionate; (2) whether the prosecutor committed fundamental error by allegedly making inappropriate remarks before the jury; and (3) whether Florida's capital sentencing procedures are unconstitutional. We address each claim in turn below and further review the sufficiency of the evidence as it relates to the first-degree murder conviction.

ANALYSIS
In his first claim, Bailey challenges whether the death sentence is disproportionate. This Court must review each sentence of death to ensure that it is proportional to other cases. Because the death penalty is reserved for only the most aggravated and the least mitigated of first-degree murders, the Court undertakes "a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Rodgers v. State, 948 So.2d 655, 669 (Fla.2006) (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)). In the absence of demonstrated legal error, the Court "accept[s] the trial court's findings on the aggravating and mitigating circumstances and consider[s] the totality of the circumstances of the case in comparing it to other capital cases." Id. at 670.
In a well-detailed order, the circuit court found two aggravating circumstances, both of which were entitled to great weight: Bailey was on probation at the time of the crime; and the crime was committed in order to avoid a lawful arrest. The court found that Bailey failed to reasonably establish either of the statutory mental mitigators (substantially impaired capacity to appreciate the criminality of his conduct and extreme emotional disturbance). The court further found that although the mitigating circumstance relating to Bailey's young age was established, it was entitled to very little weight. Finally, the court reviewed the remaining mitigation presented and weighed them as follows: (1) *552 Bailey had a low IQ (found to be reasonably established but given little weight); (2) Bailey had a history of mental health problems (found to be reasonably established but given little weight); (3) Bailey spent time in a juvenile facility and was prescribed numerous medications in an attempt to deal with his mental health problems (found to be reasonably established but given little weight); (4) Bailey was intoxicated at the time of the crime (found to be established but not to such a degree that Bailey could not conform his conduct to law; this factor was given little weight); (5) Bailey came from a broken home (found to be reasonably established but given little weight); (6) Bailey performed poorly as a student but was continually promoted despite this (found to be reasonably established but given little weight); (7) Bailey showed concern for the victim by asking about the officer shortly after he was arrested (the court questioned whether this mitigator was proven and gave it little weight in light of the aggravating circumstances); and (8) Bailey was very respectful to the court, the attorneys, and the court's staff (found to be reasonably established but given little weight).
Bailey does not challenge the court's findings relating to the presence and absence of the aggravators and mitigators but asserts that when they are weighed together, the death sentence is disproportionate. In support of his argument, Bailey relies primarily on Hardy v. State, 716 So.2d 761 (Fla.1998).[5] In Hardy, this Court found that the death penalty was disproportionate in a case where the defendant shot and killed a police officer based on a spur-of-the-moment decision to prevent the officer from finding a stolen handgun that Hardy possessed. Id. at 766. The Court stressed that this result was based on the fact that there was only a single applicable aggravator (that the victim was a law enforcement officer engaged in the performance of his official duties) and that numerous mitigators existed, including an abusive childhood and the fact that shortly after the murder, the defendant attempted to commit suicide by shooting himself in the head. The Court noted that Hardy's suicide attempt caused significant brain damage so Hardy was no longer the same person who killed the officer. Id. Bailey asserts that case is similar because Bailey likewise engaged in a spontaneous shooting in an effort to prevent an arrest, and Bailey had even more mitigation because his brain damage was not based on self-inflicted wounds.
We find that there are significant factual differences between this case and Hardy. In this case, Bailey deliberately left Wisconsin while on parole and headed to Florida to party during spring break, bringing a handgun with him. After he was pulled over, Bailey contemplated the killing of the officer for a significant time period before the shooting occurred. After the shooting, Bailey fled the scene, intimidated others into taking him to a particular bar by revealing his gun, and then went back to the hotel with his friends, where he reloaded his gun and filled his pockets with more ammunition. Much of the mitigation that Bailey presented in this case was questionable, particularly in light of Bailey's own statements that he would play all his cards in an attempt to avoid being convicted of *553 murder and sentenced to death. Additionally, the circuit court found that two significant aggravators applied in this case, while Hardy involved only a single aggravator, which was another significant consideration to this Court's decision to reduce Hardy's sentence. See, e.g., Rodgers, 948 So.2d at 670 ("We have stated that generally a death sentence is not proportionate when supported by a single aggravator and the mitigation is substantial."); Jones v. State, 705 So.2d 1364, 1367 (Fla. 1998) ("[D]eath is not indicated in a single-aggravator case where there is substantial mitigation.").
We find that the circumstances in this case are more similar to Burns v. State, 699 So.2d 646 (Fla.1997). In Burns, the defendant shot and killed a police officer after the officer stopped the vehicle and found cocaine in the car. The trial court found and merged three aggravators: (1) the victim was engaged in the performance of his official duties as a police officer when he was murdered; (2) the murder was committed to avoid arrest or to effect an escape; and (3) the murder was committed to disrupt the lawful exercise of any governmental function by or the enforcement of laws by the victim. Id. at 648. The judge found two statutory mitigating factors (the defendant's age and that the defendant had no significant history of prior criminal activity) and numerous nonstatutory mitigators, including his impoverished childhood, that he contributed to his community and society, and that he had shown some remorse. Id. at 648-49. The judge then followed the jury's unanimous recommendation that a death sentence be imposed. This Court agreed and found the sentence of death was proportional under the facts of the case. In comparing this case to Burns, the facts are similar, but Burns actually involves fewer aggravators.
Similarly, in Reaves v. State, 639 So.2d 1 (Fla.1994), the defendant shot a police officer after shortly after the officer responded to a 911 telephone call and conducted a warrants check on the defendant. The trial court found two aggravators (prior violent felonies and that the murder was committed to avoid a lawful arrest)[6] and relatively weak mitigation. After reviewing the circumstances of the case, the aggravators, and the mitigators, this Court affirmed the death sentence. Id. at 6. The circumstances of Bailey's case are similar to Reaves. Numerous other cases likewise support the conclusion that death is a proportional sentence. See, e.g., Gonzalez v. State, 786 So.2d 559, 569 (Fla.2001) (affirming the death sentence in a case which involved the killing of a police officer during the course of a robbery and contained three aggravating circumstances,[7] the statutory mitigator that the defendant lacked a significant criminal history, and numerous nonstatutory mitigators); Armstrong v. State, 642 So.2d 730, 740 (Fla.1994) (affirming the death sentence in a case which involved the killing of a police officer during the course of a robbery and contained similar aggravation).
We find that the circuit court's rejection of the statutory mental mitigating factors *554 is supported by competent, substantial evidence and that the court did not abuse its discretion in assigning the weight of the aggravating and mitigating factors. After reviewing the totality of the circumstances, we find this case is comparable to Burns, Reaves, and Gonzalez, and hold that the sentence of death is proportional.
In his second argument, Bailey asserts that fundamental error occurred when the prosecutor made four different arguments to the jury. Because defense counsel did not object to these numerous arguments during trial, in order to obtain relief on such claims, the comments must rise to the level of fundamental error. See, e.g., Merck v. State, 975 So.2d 1054, 1061 (Fla.2007) ("Counsel must contemporaneously object to improper comments to preserve a claim for appellate review. Unobjected-to comments are grounds for reversal only if they rise to the level of fundamental error."), cert. denied, ___ U.S. ___, 129 S.Ct. 73, 172 L.Ed.2d 66 (2008). This is a high burden which requires an error that "goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process." Johnson v. State, 969 So.2d 938, 955 (Fla.2007) (quoting J.B. v. State, 705 So.2d 1376, 1378 (Fla.1998)), cert. denied, ___ U.S. ___, 128 S.Ct. 2056, 170 L.Ed.2d 799 (2008).
Bailey first asserts that the prosecutor improperly positioned himself as a member of the jurors' community who represented the community's best interest when the prosecutor introduced himself to a panel of potential jurors as follows: "Good morning, I'm Steve Meadows, I'm the State Attorney for the 14th Circuit and I'm here representing the community." We reject Bailey's argument that this statement constitutes an improper argument. In Cox v. State, 819 So.2d 705, 718 (Fla.2002), the prosecutor told the jurors, "I stand before you again today on behalf of the decent law-abiding people of this community and this state, whom I represent." After noting that the State Attorney only stated whom he represented, this Court held that this was not the type of intolerable statement that appealed to the emotions and fears of the jury and did not constitute a wrongful "message to the community" argument. Id. In turning to Bailey's claim, the State Attorney's introduction of himself was in the same vein, only much less grandiose, and likewise, this statement cannot constitute error, much less fundamental error.
Next, Bailey asserts that the prosecutor committed fundamental error by repeatedly stressing a theme that demonized Bailey as evil and an outsider. In support of this contention, Bailey points to various statements that the prosecutor made during the opening statement, for example:
Easter Sunday, March 27th, 2005 began like many, many other Easters throughout this country over the years. But in our community on that day an ill wind began to blow, a strong wind, a wind that the people who were there will remember for the rest of their lives. It was brutal and it was continuing.
The prosecutor made similar statements during closing arguments, as well as an argument that summarized an eyewitness's testimony as follows:
A bullet has just gone through the glass. He's seen the fire. He saw the [defendant's] face, a face he described as mean, angry. I submit evil.
Ladies and gentlemen, by the facts and the evidence that have been presented to you over the last two days you too have seen the face of the defendant.
In Carroll v. State, 815 So.2d 601, 622 (Fla.2002), the Court addressed a habeas claim where the defendant asserted that *555 his appellate counsel was ineffective for failing to raise the prosecutor's improper arguments made during the penalty phase where the prosecutor stated that Carroll was the "boogie man" and a "creature that stalked the night" who "must die." This Court held that although the comments were improper and ill-advised, the comments were "not as egregious or cumulative in scope as in cases where this Court has found fundamental error." Id. Likewise, in Moore v. State, 820 So.2d 199, 207 (Fla.2002), this Court addressed a postconviction claim which alleged that defense counsel was ineffective in failing to object to two different occasions where the prosecutor called the defendant "the devil." Id. For example, during one of the arguments, the prosecutor told the jury, "Crime conceived in hell will not have any angels as witnesses. And, ladies and gentleman, as true as that statement is, Grand Park is hell. And that man right there is the devil." While the Court disapproved of the prosecutor's comment calling Carroll the devil, the Court held that the conduct was not so prejudicial as to vitiate the entire trial.
In turning to Bailey's claim, we reject Bailey's assertion that the prosecutor's comments vilified the defendant. The prosecutor commented on evidence before the jury regarding the wind on the night of the crime and regarding an expression on the defendant's face, suggesting that the expression was evil. Even if this Court accepted Bailey's characterization of the statements, the statements are significantly less egregious than those in Moore and Carroll, and thus cannot establish fundamental error here.
In his third subclaim, Bailey asserts that the prosecutor made an improper golden rule argument when he made the following statement during closing arguments:
I ask that as you sit down in the juryroom to deliberate you do two things before you reach time to take a vote. I want you all just to put your finger 18 to 24 inches away from each other's face and see how close you are when your eyes are meeting, as his met those eyes on an Easter night in our community and in 18 to 24 inches away firing once, twice, and three times.
This Court has long prohibited golden rule arguments which "`invite the jurors to place themselves in the victim's position' and `imagine the victim's final pain, terror and defenselessness.'" Merck, 975 So.2d at 1062. Specifically, in Merck, the prosecutor timed one minute and then said:
Now. That's one minute. How many thoughts went through your mind in that one minute? Did he live two minutes? Did he live three minutes? Four minutes? Enough time for his life to go, roll his eyes, to think about the people that he would never see again. Was that an unnecessarily torturous way for the man to lose his life that night for no good reason?
975 So.2d at 1062. We held that the argument in Merck was not a golden rule argument or otherwise improper given its context, but was a comment that was designed to illustrate how long one minute can actually be. Id. at 1064. Similarly, we hold that the challenged arguments here in Bailey do not constitute a golden rule argument. The prosecutor was using the facts in evidence in the case which established that based on the stippling on Sergeant Kight's face, the gun was eighteen to twenty-four inches away when it was fired. This comment did not encourage the jurors to place themselves in the victim's position but instead was designed to help the jury to visualize the distance between the gun and the victim and was in response to the defendant's theory that Bailey *556 did not intend to kill the officer. We hold that both individually and cumulatively Bailey is not entitled to relief on the now-challenged arguments which occurred during the guilt phase.
Bailey also asserts that the prosecutor committed fundamental error during the penalty phase by asserting that Bailey was "unworthy of the mitigation that was presented" when he made the following argument:
Ladies and gentlemen, the heart of the matter is that this is a cold, brutal, savage murder committed with aggravation that I have explained. The heart of this Defendant is one that is unworthy of the mitigation that has been presented. It has not been reasonably established. I ask that you apply the weight that is in your heart and that you render a verdict of justice, a verdict which rights the scales, a verdict where the sword goes unscabbard.
Bailey's characterization of the closing is inaccurate and out of context. The prosecutor explicitly argued that the jury should not accept Bailey's mitigation because it had "not been reasonably established." The statement, when viewed in its full context, does not amount to error, much less fundamental error.
In his final issue, Bailey asserts that this Court should hold that Florida's capital sentencing procedures are unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). As Bailey recognizes, this Court has repeatedly rejected this claim. See, e.g., Coday v. State, 946 So.2d 988, 1005-06 (Fla. 2006) (explicitly rejecting the claim that the United States Supreme Court's decision in Ring requires a finding that the Florida capital sentencing scheme is unconstitutional, rejecting the claim that a jury must unanimously recommend death, and rejecting the claim that the State must allege the aggravating circumstances in the indictment); Woodel v. State, 985 So.2d 524, 533 (Fla.2008) (declining to revisit this issue), cert. denied, ___ U.S. ___, 129 S.Ct. 607, ___ L.Ed.2d ___ (2008). Accordingly, we deny this claim.
In the final issue to be addressed, this Court must review the sufficiency of the evidence as it relates to the murder conviction. Even though Bailey has not challenged the sufficiency of the evidence, this Court has "the independent duty to review the record in each death penalty case to determine whether competent, substantial evidence supports the murder conviction." Buzia v. State, 926 So.2d 1203, 1217 (Fla.2006).
In this case, the State presented evidence which showed that on the evening of March 27, 2005, Sergeant Kight stopped Bailey for minor traffic infractions and was running a license check on him. While the officer was engaged in the license check, Bailey told his friend Crawford that he did not have a valid license and that he was not going back to prison. At 10:26 p.m., Crawford heard Bailey tell his girlfriend that Bailey would "pop this cop" if the officer tried to arrest him. After he saw Bailey put a gun under his right leg, Crawford left the vehicle and was not present when the shooting occurred. However, the State presented eyewitness testimony from two people who were driving by at the time of the shooting and testified that they saw Bailey shoot the officer after the officer approached the vehicle with handcuffs in his hand. At 10:30 p.m., Officer Kight reported to dispatch that he had been shot. Corey Lawson testified that on the night of the crime, Bailey jumped into the back of the pickup truck in which he was riding and told Lawson that he had "just popped a cop" because he was wanted for a "bunch of stuff" and the only way that the police would catch him was if they *557 killed him. Bailey lifted up his shirt enough so that a gun was visible and directed the people in the truck to take him to a particular bar. When Bailey was caught the next day, he had the murder weapon tucked into the waistband of his pants. We find that competent, substantial evidence supports Bailey's first-degree murder conviction.

CONCLUSION
For the above reasons, we find all of Bailey's claims to be without merit. Accordingly, we affirm Bailey's conviction and the sentence of death.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
NOTES
[1] One call lasted for one second, and the second call lasted for a little under two minutes.
[2] Spencer v. State, 615 So.2d 688 (Fla. 1993).
[3] The circuit court found that the capital felony was committed by a person previously convicted of a felony and under the sentence of imprisonment or placed on community control or probation, and the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
[4] These proposed mitigating circumstances were: (1) whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (2) whether the crime for which the defendant was to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance.
[5] Bailey also cited to Brown v. State, 526 So.2d 903 (Fla. 1988), a case in which this Court reversed the death sentence of a defendant who shot and killed a police officer in order to avoid arrest. In Brown, however, the jury recommended life, and the trial court overrode this recommendation. As this Court has recognized, "[j]ury override cases involve a wholly different legal principle" and are thus distinguishable. Burns v. State, 699 So.2d 646, 649 n. 5 (Fla. 1997).
[6] The trial court also found that the crime was heinous, atrocious, or cruel, but this Court struck that aggravating circumstance.
[7] The trial court found six aggravators but merged numerous aggravators into a total of three aggravators: (1) the defendant had a prior violent felony conviction; (2) the crime occurred during the commission of a robbery, which was merged with the aggravator that it was committed for pecuniary gain; and (3) the crime was committed for the purpose of avoiding a lawful arrest, which was merged with the aggravators that the crime was committed to hinder the enforcement of laws and that the victim was a law enforcement officer who was performing his official duties.